CHIEF JUSTICE ROBERTS delivered the opinion of the Court.
*2026 Over the course of five days in April 2019, three committees of the U. S. House of Representatives issued four subpoenas seeking information about the finances of President Donald J. Trump, his children, and affiliated businesses. We have held that the House has authority under the Constitution to issue subpoenas to assist it in carrying out its legislative responsibilities. The House asserts that the financial information sought here-encompassing a decade's worth of transactions by the President and his family-will help guide legislative reform in areas ranging from money laundering and terrorism to foreign involvement in U. S. elections. The President contends that the House lacked a valid legislative aim and instead sought these records to harass him, expose personal matters, and conduct law enforcement activities beyond its authority. The question presented is whether the subpoenas exceed the authority of the House under the Constitution.
We have never addressed a congressional subpoena for the President's information. Two hundred years ago, it was established that Presidents may be subpoenaed during a federal criminal proceeding, United States v. Burr , 25 F.Cas. 30 (No. 14,692d) (CC Va. 1807) (Marshall, Cir. J.), and earlier today we extended that ruling to state criminal proceedings, Trump v. Vance, ante , --- U.S. at p. ----, 140 S.Ct. at p. ----. Nearly fifty years ago, we held that a federal prosecutor could obtain information from a President despite assertions of executive privilege, United States v. Nixon , 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), and more recently we ruled that a private litigant could subject a President to a damages suit and appropriate discovery obligations in federal court, Clinton v. Jones , 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997).
This case is different. Here the President's information is sought not by prosecutors or private parties in connection with a particular judicial proceeding, but by committees of Congress that have set forth broad legislative objectives. Congress and the President-the two political branches established by the Constitution-have an ongoing relationship that the Framers intended to feature both rivalry and reciprocity. See The Federalist No. 51, p. 349 (J. Cooke ed. 1961) (J. Madison); Youngstown Sheet & Tube Co. v. Sawyer , 343 U.S. 579, 635, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). That distinctive aspect necessarily informs our analysis of the question before us.
I
A
Each of the three committees sought overlapping sets of financial documents, *2027 but each supplied different justifications for the requests.
The House Committee on Financial Services issued two subpoenas, both on April 11, 2019. App. 128, 154, 226. The first, issued to Deutsche Bank, seeks the financial information of the President, his children, their immediate family members, and several affiliated business entities. Specifically, the subpoena seeks any document related to account activity, due diligence, foreign transactions, business statements, debt schedules, statements of net worth, tax returns, and suspicious activity identified by Deutsche Bank. The second, issued to Capital One, demands similar financial information with respect to more than a dozen business entities associated with the President. The Deutsche Bank subpoena requests materials from "2010 through the present," and the Capital One subpoena covers "2016 through the present," but both subpoenas impose no time limitations for certain documents, such as those connected to account openings and due diligence. Id., at 128, 155.
According to the House, the Financial Services Committee issued these subpoenas pursuant to House Resolution 206, which called for "efforts to close loopholes that allow corruption, terrorism, and money laundering to infiltrate our country's financial system." H. Res. 206, 116th Cong., 1st Sess., 5 (Mar. 13, 2019). Such loopholes, the resolution explained, had allowed "illicit money, including from Russian oligarchs," to flow into the United States through "anonymous shell companies" using investments such as "luxury high-end real estate." Id. , at 3. The House also invokes the oversight plan of the Financial Services Committee, which stated that the Committee intends to review banking regulation and "examine the implementation, effectiveness, and enforcement" of laws designed to prevent money laundering and the financing of terrorism. H. R. Rep. No. 116-40, p. 84 (2019). The plan further provided that the Committee would "consider proposals to prevent the abuse of the financial system" and "address any vulnerabilities identified" in the real estate market. Id. , at 85.
On the same day as the Financial Services Committee, the Permanent Select Committee on Intelligence issued an identical subpoena to Deutsche Bank-albeit for different reasons. According to the House, the Intelligence Committee subpoenaed Deutsche Bank as part of an investigation into foreign efforts to undermine the U. S. political process. Committee Chairman Adam Schiff had described that investigation in a previous statement, explaining that the Committee was examining alleged attempts by Russia to influence the 2016 election; potential links between Russia and the President's campaign; and whether the President and his associates had been compromised by foreign actors or interests. Press Release, House Permanent Select Committee on Intelligence, Chairman Schiff Statement on House Intelligence Committee Investigation (Feb. 6, 2019). Chairman Schiff added that the Committee planned "to develop legislation and policy reforms to ensure the U. S. government is better positioned to counter future efforts to undermine our political process and national security." Ibid.
Four days after the Financial Services and Intelligence Committees, the House Committee on Oversight and Reform issued another subpoena, this time to the President's personal accounting firm, Mazars USA, LLP. The subpoena demanded information related to the President and several affiliated business entities from 2011 through 2018, including statements of financial condition, independent auditors' reports, financial reports, underlying source documents, and communications between *2028 Mazars and the President or his businesses. The subpoena also requested all engagement agreements and contracts "[w]ithout regard to time." App. to Pet. for Cert. in 19-715, p. 230.
Chairman Elijah Cummings explained the basis for the subpoena in a memorandum to the Oversight Committee. According to the chairman, recent testimony by the President's former personal attorney Michael Cohen, along with several documents prepared by Mazars and supplied by Cohen, raised questions about whether the President had accurately represented his financial affairs. Chairman Cummings asserted that the Committee had "full authority to investigate" whether the President: (1) "may have engaged in illegal conduct before and during his tenure in office," (2) "has undisclosed conflicts of interest that may impair his ability to make impartial policy decisions," (3) "is complying with the Emoluments Clauses of the Constitution," and (4) "has accurately reported his finances to the Office of Government Ethics and other federal entities." App. in No. 19-5142 (CADC), p. 107. "The Committee's interest in these matters," Chairman Cummings concluded, "informs its review of multiple laws and legislative proposals under our jurisdiction." Ibid.
B
Petitioners-the President in his personal capacity, along with his children and affiliated businesses-filed two suits challenging the subpoenas. They contested the subpoena issued by the Oversight Committee in the District Court for the District of Columbia (Mazars , No. 19-715), and the subpoenas issued by the Financial Services and Intelligence Committees in the Southern District of New York (Deutsche Bank , No. 19-760). In both cases, petitioners contended that the subpoenas lacked a legitimate legislative purpose and violated the separation of powers. The President did not, however, resist the subpoenas by arguing that any of the requested records were protected by executive privilege. For relief, petitioners asked for declaratory judgments and injunctions preventing Mazars and the banks from complying with the subpoenas. Although named as defendants, Mazars and the banks took no positions on the legal issues in these cases, and the House committees intervened to defend the subpoenas.
Petitioners' challenges failed. In Mazars , the District Court granted judgment for the House, 380 F.Supp.3d 76 (DC 2019), and the D. C. Circuit affirmed, 940 F.3d 710 (2019). In upholding the subpoena issued by the Oversight Committee to Mazars, the Court of Appeals found that the subpoena served a "valid legislative purpose" because the requested information was relevant to reforming financial disclosure requirements for Presidents and presidential candidates. Id. , at 726-742 (internal quotation marks omitted). Judge Rao dissented. As she saw it, the "gravamen" of the subpoena was investigating alleged illegal conduct by the President, and the House must pursue such wrongdoing through its impeachment powers, not its legislative powers. Id. , at 773-774. Otherwise, the House could become a "roving inquisition over a co-equal branch of government." Id. , at 748. The D. C. Circuit denied rehearing en banc over several more dissents. 941 F.3d 1180, 1180-1182 (2019).
In Deutsche Bank , the District Court denied a preliminary injunction, 2019 WL 2204898 (SDNY, May 22, 2019), and the Second Circuit affirmed "in substantial part," 943 F.3d 627, 676 (2019). While acknowledging that the subpoenas are "surely broad in scope," the Court of Appeals held that the Intelligence Committee properly *2029 issued its subpoena to Deutsche Bank as part of an investigation into alleged foreign influence over petitioners and Russian interference with the U. S. political process. Id. , at 650, 658-659. That investigation, the court concluded, could inform legislation to combat foreign meddling and strengthen national security. Id. , at 658-659, and n. 59.
As to the subpoenas issued by the Financial Services Committee to Deutsche Bank and Capital One, the Court of Appeals concluded that they were adequately related to potential legislation on money laundering, terrorist financing, and the global movement of illicit funds through the real estate market. Id. , at 656-659. Rejecting the contention that the subpoenas improperly targeted the President, the court explained in part that the President's financial dealings with Deutsche Bank made it "appropriate" for the House to use him as a "case study" to determine "whether new legislation is needed." Id. , at 662-663, n. 67.[1]
Judge Livingston dissented, seeing no "clear reason why a congressional investigation aimed generally at closing regulatory loopholes in the banking system need focus on over a decade of financial information regarding this President, his family, and his business affairs." Id. , at 687.
We granted certiorari in both cases and stayed the judgments below pending our decision. 589 U. S. ----, 140 S.Ct. 660, 205 L.Ed.2d 418 (2019).
II
A
The question presented is whether the subpoenas exceed the authority of the House under the Constitution. Historically, disputes over congressional demands for presidential documents have not ended up in court. Instead, they have been hashed out in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel).
That practice began with George Washington and the early Congress. In 1792, a House committee requested Executive Branch documents pertaining to General St. Clair's campaign against the Indians in the Northwest Territory, which had concluded in an utter rout of federal forces when they were caught by surprise near the present-day border between Ohio and Indiana. See T. Taylor, Grand Inquest: The Story of Congressional Investigations 19-23 (1955). Since this was the first such request from Congress, President Washington called a Cabinet meeting, wishing to take care that his response "be rightly conducted" because it could "become a precedent." 1 Writings of Thomas Jefferson 189 (P. Ford ed. 1892).
The meeting, attended by the likes of Alexander Hamilton, Thomas Jefferson, Edmund Randolph, and Henry Knox, ended with the Cabinet of "one mind": The House had authority to "institute inquiries" and "call for papers" but the President could "exercise a discretion" over disclosures, "communicat[ing] such papers as *2030 the public good would permit" and "refus[ing]" the rest. Id. , at 189-190. President Washington then dispatched Jefferson to speak to individual congressmen and "bring them by persuasion into the right channel." Id. , at 190. The discussions were apparently fruitful, as the House later narrowed its request and the documents were supplied without recourse to the courts. See 3 Annals of Cong. 536 (1792); Taylor, supra , at 24.
Jefferson, once he became President, followed Washington's precedent. In early 1807, after Jefferson had disclosed that "sundry persons" were conspiring to invade Spanish territory in North America with a private army, 16 Annals of Cong. 686-687, the House requested that the President produce any information in his possession touching on the conspiracy (except for information that would harm the public interest), id. , at 336, 345, 359. Jefferson chose not to divulge the entire "voluminous" correspondence on the subject, explaining that much of it was "private" or mere "rumors" and "neither safety nor justice" permitted him to "expos[e] names" apart from identifying the conspiracy's "principal actor": Aaron Burr. Id. , at 39-40. Instead of the entire correspondence, Jefferson sent Congress particular documents and a special message summarizing the conspiracy. Id. , at 39-43; see generally Vance, ante , --- U.S. at ---- - ----, 140 S.Ct. at 2421 - 2422. Neither Congress nor the President asked the Judiciary to intervene.[2]
Ever since, congressional demands for the President's information have been resolved by the political branches without involving this Court. The Reagan and Clinton presidencies provide two modern examples:
During the Reagan administration, a House subcommittee subpoenaed all documents related to the Department of the Interior's decision whether to designate Canada a reciprocal country for purposes of the Mineral Lands Leasing Act. President Reagan directed that certain documents be withheld because they implicated his confidential relationship with subordinates. While withholding those documents, the administration made "repeated efforts" at accommodation through limited disclosures and testimony over a period of several months. 6 Op. of Office of Legal Counsel 751, 780 (1982). Unsatisfied, the subcommittee and its parent committee eventually voted to hold the Secretary of the Interior in contempt, and an innovative compromise soon followed: All documents were made available, but only for one day with no photocopying, minimal notetaking, and no participation by non-Members of Congress. Id. , at 780-781; see H. R. Rep. No. 97-898, pp. 3-8 (1982).
In 1995, a Senate committee subpoenaed notes taken by a White House attorney at a meeting with President Clinton's personal lawyers concerning the Whitewater controversy. The President resisted the subpoena on the ground that the notes were protected by attorney-client privilege, leading to "long and protracted" negotiations and a Senate threat to seek judicial enforcement of the subpoena. S. Rep. No. 104-204, pp. 16-17 (1996). Eventually the parties reached an agreement, whereby President Clinton avoided the threatened suit, agreed to turn over the notes, and obtained the Senate's concession that he *2031 had not waived any privileges. Ibid. ; see L. Fisher, Congressional Research Service, Congressional Investigations: Subpoenas and Contempt Power 16-18 (2003).
Congress and the President maintained this tradition of negotiation and compromise-without the involvement of this Court-until the present dispute. Indeed, from President Washington until now, we have never considered a dispute over a congressional subpoena for the President's records. And, according to the parties, the appellate courts have addressed such a subpoena only once, when a Senate committee subpoenaed President Nixon during the Watergate scandal. See infra , at 2032 - 2033 (discussing Senate Select Committee on Presidential Campaign Activities v. Nixon , 498 F.2d 725 (CADC 1974) (en banc)). In that case, the court refused to enforce the subpoena, and the Senate did not seek review by this Court.
This dispute therefore represents a significant departure from historical practice. Although the parties agree that this particular controversy is justiciable, we recognize that it is the first of its kind to reach this Court; that disputes of this sort can raise important issues concerning relations between the branches; that related disputes involving congressional efforts to seek official Executive Branch information recur on a regular basis, including in the context of deeply partisan controversy; and that Congress and the Executive have nonetheless managed for over two centuries to resolve such disputes among themselves without the benefit of guidance from us. Such longstanding practice " 'is a consideration of great weight' " in cases concerning "the allocation of power between [the] two elected branches of Government," and it imposes on us a duty of care to ensure that we not needlessly disturb "the compromises and working arrangements that [those] branches ... themselves have reached." NLRB v. Noel Canning , 573 U.S. 513, 524-526, 134 S.Ct. 2550, 189 L.Ed.2d 538 (2014) (quoting The Pocket Veto Case , 279 U.S. 655, 689, 49 S.Ct. 463, 73 L.Ed. 894 (1929) ). With that in mind, we turn to the question presented.
B
Congress has no enumerated constitutional power to conduct investigations or issue subpoenas, but we have held that each House has power "to secure needed information" in order to legislate. McGrain v. Daugherty , 273 U.S. 135, 161, 47 S.Ct. 319, 71 L.Ed. 580 (1927). This "power of inquiry-with process to enforce it-is an essential and appropriate auxiliary to the legislative function." Id. , at 174, 47 S.Ct. 319. Without information, Congress would be shooting in the dark, unable to legislate "wisely or effectively." Id. , at 175, 47 S.Ct. 319. The congressional power to obtain information is "broad" and "indispensable." Watkins v. United States , 354 U.S. 178, 187, 215, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957). It encompasses inquiries into the administration of existing laws, studies of proposed laws, and "surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." Id. , at 187, 77 S.Ct. 1173.
Because this power is "justified solely as an adjunct to the legislative process," it is subject to several limitations. Id. , at 197, 77 S.Ct. 1173. Most importantly, a congressional subpoena is valid only if it is "related to, and in furtherance of, a legitimate task of the Congress." Id. , at 187, 77 S.Ct. 1173. The subpoena must serve a "valid legislative purpose," Quinn v. United States , 349 U.S. 155, 161, 75 S.Ct. 668, 99 L.Ed. 964 (1955) ; it must "concern[ ] a subject on which legislation 'could be had,' "
*2032 Eastland v. United States Servicemen's Fund , 421 U.S. 491, 506, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975) (quoting McGrain , 273 U.S. at 177, 47 S.Ct. 319 ).
Furthermore, Congress may not issue a subpoena for the purpose of "law enforcement," because "those powers are assigned under our Constitution to the Executive and the Judiciary." Quinn , 349 U.S. at 161, 75 S.Ct. 668. Thus Congress may not use subpoenas to "try" someone "before [a] committee for any crime or wrongdoing." McGrain , 273 U.S. at 179, 47 S.Ct. 319. Congress has no " 'general' power to inquire into private affairs and compel disclosures," id. , at 173-174, 47 S.Ct. 319, and "there is no congressional power to expose for the sake of exposure," Watkins , 354 U.S. at 200, 77 S.Ct. 1173. "Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." Id. , at 187, 77 S.Ct. 1173.
Finally, recipients of legislative subpoenas retain their constitutional rights throughout the course of an investigation. See id. , at 188, 198, 77 S.Ct. 1173. And recipients have long been understood to retain common law and constitutional privileges with respect to certain materials, such as attorney-client communications and governmental communications protected by executive privilege. See, e.g. , Congressional Research Service, supra, at 16-18 (attorney-client privilege); Senate Select Committee , 498 F.2d at 727, 730-731 (executive privilege).
C
The President contends, as does the Solicitor General appearing on behalf of the United States, that the usual rules for congressional subpoenas do not govern here because the President's papers are at issue. They argue for a more demanding standard based in large part on cases involving the Nixon tapes-recordings of conversations between President Nixon and close advisers discussing the break-in at the Democratic National Committee's headquarters at the Watergate complex. The tapes were subpoenaed by a Senate committee and the Special Prosecutor investigating the break-in, prompting President Nixon to invoke executive privilege and leading to two cases addressing the showing necessary to require the President to comply with the subpoenas. See Nixon , 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 ; Senate Select Committee , 498 F.2d 725.
Those cases, the President and the Solicitor General now contend, establish the standard that should govern the House subpoenas here. Quoting Nixon , the President asserts that the House must establish a "demonstrated, specific need" for the financial information, just as the Watergate special prosecutor was required to do in order to obtain the tapes. 418 U.S. at 713, 94 S.Ct. 3090. And drawing on Senate Select Committee -the D. C. Circuit case refusing to enforce the Senate subpoena for the tapes-the President and the Solicitor General argue that the House must show that the financial information is "demonstrably critical" to its legislative purpose. 498 F.2d at 731.
We disagree that these demanding standards apply here. Unlike the cases before us, Nixon and Senate Select Committee involved Oval Office communications over which the President asserted executive privilege. That privilege safeguards the public interest in candid, confidential deliberations within the Executive Branch; it is "fundamental to the operation of Government." Nixon , 418 U.S. at 708, 94 S.Ct. 3090. As a result, information subject to executive privilege deserves "the greatest protection consistent with the fair administration of justice." Id. , at 715, 94 S.Ct. 3090. We decline to transplant *2033 that protection root and branch to cases involving nonprivileged, private information, which by definition does not implicate sensitive Executive Branch deliberations.
The standards proposed by the President and the Solicitor General-if applied outside the context of privileged information-would risk seriously impeding Congress in carrying out its responsibilities. The President and the Solicitor General would apply the same exacting standards to all subpoenas for the President's information, without recognizing distinctions between privileged and nonprivileged information, between official and personal information, or between various legislative objectives. Such a categorical approach would represent a significant departure from the longstanding way of doing business between the branches, giving short shrift to Congress's important interests in conducting inquiries to obtain the information it needs to legislate effectively. Confounding the legislature in that effort would be contrary to the principle that:
"It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents. Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served." United States v. Rumely , 345 U.S. 41, 43, 73 S.Ct. 543, 97 L.Ed. 770 (1953) (internal quotation marks omitted).
Legislative inquiries might involve the President in appropriate cases; as noted, Congress's responsibilities extend to "every affair of government." Ibid. (internal quotation marks omitted). Because the President's approach does not take adequate account of these significant congressional interests, we do not adopt it.
D
The House meanwhile would have us ignore that these suits involve the President. Invoking our precedents concerning investigations that did not target the President's papers, the House urges us to uphold its subpoenas because they "relate[ ] to a valid legislative purpose" or "concern[ ] a subject on which legislation could be had." Brief for Respondent 46 (quoting Barenblatt v. United States , 360 U.S. 109, 127, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959), and Eastland , 421 U.S. at 506, 95 S.Ct. 1813 ). That approach is appropriate, the House argues, because the cases before us are not "momentous separation-of-powers disputes." Brief for Respondent 1.
Largely following the House's lead, the courts below treated these cases much like any other, applying precedents that do not involve the President's papers. See 943 F.3d at 656-670 ; 940 F.3d at 724-742. The Second Circuit concluded that "this case does not concern separation of powers" because the House seeks personal documents and the President sued in his personal capacity. 943 F.3d at 669. The D. C. Circuit, for its part, recognized that "separation-of-powers concerns still linger in the air," and therefore it did not afford deference to the House. 940 F.3d at 725-726. But, because the House sought only personal documents, the court concluded that the case "present[ed] no direct interbranch dispute." Ibid.
The House's approach fails to take adequate account of the significant separation of powers issues raised by congressional subpoenas for the President's information. Congress and the President have an ongoing institutional relationship as the "opposite and rival" political branches established *2034 by the Constitution. The Federalist No. 51, at 349. As a result, congressional subpoenas directed at the President differ markedly from congressional subpoenas we have previously reviewed, e.g. , Barenblatt , 360 U.S. at 127, 79 S.Ct. 1081 ; Eastland , 421 U.S. at 506, 95 S.Ct. 1813, and they bear little resemblance to criminal subpoenas issued to the President in the course of a specific investigation, see Vance, ante , --- U.S. p., ----, 140 S.Ct., p. ---- ; Nixon , 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039. Unlike those subpoenas, congressional subpoenas for the President's information unavoidably pit the political branches against one another. Cf. In re Sealed Case , 121 F.3d 729, 753 (CADC 1997) ("The President's ability to withhold information from Congress implicates different constitutional considerations than the President's ability to withhold evidence in judicial proceedings.").
Far from accounting for separation of powers concerns, the House's approach aggravates them by leaving essentially no limits on the congressional power to subpoena the President's personal records. Any personal paper possessed by a President could potentially "relate to" a conceivable subject of legislation, for Congress has broad legislative powers that touch a vast number of subjects. Brief for Respondent 46. The President's financial records could relate to economic reform, medical records to health reform, school transcripts to education reform, and so on. Indeed, at argument, the House was unable to identify any type of information that lacks some relation to potential legislation. See Tr. of Oral Arg. 52-53, 62-65.
Without limits on its subpoena powers, Congress could "exert an imperious controul" over the Executive Branch and aggrandize itself at the President's expense, just as the Framers feared. The Federalist No. 71, at 484 (A. Hamilton); see id. , No. 48, at 332-333 (J. Madison); Bowsher v. Synar , 478 U.S. 714, 721-722, 727, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). And a limitless subpoena power would transform the "established practice" of the political branches. Noel Canning , 573 U.S. at 524, 134 S.Ct. 2550 (internal quotation marks omitted). Instead of negotiating over information requests, Congress could simply walk away from the bargaining table and compel compliance in court.
The House and the courts below suggest that these separation of powers concerns are not fully implicated by the particular subpoenas here, but we disagree. We would have to be "blind" not to see what "[a]ll others can see and understand": that the subpoenas do not represent a run-of-the-mill legislative effort but rather a clash between rival branches of government over records of intense political interest for all involved. Rumely , 345 U.S. at 44, 73 S.Ct. 543 (quoting Child Labor Tax Case , 259 U.S. 20, 37, 42 S.Ct. 449, 66 L.Ed. 817 (1922) (Taft, C. J.)).
The interbranch conflict here does not vanish simply because the subpoenas seek personal papers or because the President sued in his personal capacity. The President is the only person who alone composes a branch of government. As a result, there is not always a clear line between his personal and official affairs. "The interest of the man" is often "connected with the constitutional rights of the place." The Federalist No. 51, at 349. Given the close connection between the Office of the President and its occupant, congressional demands for the President's papers can implicate the relationship between the branches regardless whether those papers are personal or official. Either way, a demand may aim to harass the President or render him "complaisan[t] to the humors of the Legislature." Id. , No. 71, at 483. In *2035 fact, a subpoena for personal papers may pose a heightened risk of such impermissible purposes, precisely because of the documents' personal nature and their less evident connection to a legislative task. No one can say that the controversy here is less significant to the relationship between the branches simply because it involves personal papers. Quite the opposite. That appears to be what makes the matter of such great consequence to the President and Congress.
In addition, separation of powers concerns are no less palpable here simply because the subpoenas were issued to third parties. Congressional demands for the President's information present an interbranch conflict no matter where the information is held-it is, after all, the President's information. Were it otherwise, Congress could sidestep constitutional requirements any time a President's information is entrusted to a third party-as occurs with rapidly increasing frequency. Cf. Carpenter v. United States , 585 U. S. ----, ----, ----, 138 S.Ct. 2206, 2219, 2220, 201 L.Ed.2d 507(2018). Indeed, Congress could declare open season on the President's information held by schools, archives, internet service providers, e-mail clients, and financial institutions. The Constitution does not tolerate such ready evasion; it "deals with substance, not shadows." Cummings v. Missouri , 4 Wall. 277, 325, 18 L.Ed. 356 (1867).
E
Congressional subpoenas for the President's personal information implicate weighty concerns regarding the separation of powers. Neither side, however, identifies an approach that accounts for these concerns. For more than two centuries, the political branches have resolved information disputes using the wide variety of means that the Constitution puts at their disposal. The nature of such interactions would be transformed by judicial enforcement of either of the approaches suggested by the parties, eroding a "[d]eeply embedded traditional way[ ] of conducting government." Youngstown Sheet & Tube Co. , 343 U.S. at 610, 72 S.Ct. 863 (Frankfurter, J., concurring).
A balanced approach is necessary, one that takes a "considerable impression" from "the practice of the government," McCulloch v. Maryland , 4 Wheat. 316, 401, 4 L.Ed. 579 (1819) ; see Noel Canning , 573 U.S. at 524-526, 134 S.Ct. 2550, and "resist[s]" the "pressure inherent within each of the separate Branches to exceed the outer limits of its power," INS v. Chadha , 462 U.S. 919, 951, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). We therefore conclude that, in assessing whether a subpoena directed at the President's personal information is "related to, and in furtherance of, a legitimate task of the Congress," Watkins , 354 U.S. at 187, 77 S.Ct. 1173, courts must perform a careful analysis that takes adequate account of the separation of powers principles at stake, including both the significant legislative interests of Congress and the "unique position" of the President, Clinton , 520 U.S. at 698, 117 S.Ct. 1636 (internal quotation marks omitted). Several special considerations inform this analysis.
First, courts should carefully assess whether the asserted legislative purpose warrants the significant step of involving the President and his papers. " '[O]ccasion[s] for constitutional confrontation between the two branches' should be avoided whenever possible." Cheney v. United States Dist. Court for D. C. , 542 U.S. 367, 389-390, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004) (quoting Nixon , 418 U.S. at 692, 94 S.Ct. 3090 ). Congress may not rely on the President's information if other sources could reasonably provide *2036 Congress the information it needs in light of its particular legislative objective. The President's unique constitutional position means that Congress may not look to him as a "case study" for general legislation. Cf. 943 F.3d at 662-663, n. 67.
Unlike in criminal proceedings, where "[t]he very integrity of the judicial system" would be undermined without "full disclosure of all the facts," Nixon , 418 U.S. at 709, 94 S.Ct. 3090, efforts to craft legislation involve predictive policy judgments that are "not hamper[ed] ... in quite the same way" when every scrap of potentially relevant evidence is not available, Cheney , 542 U.S. at 384, 124 S.Ct. 2576 ; see Senate Select Committee , 498 F.2d at 732. While we certainly recognize Congress's important interests in obtaining information through appropriate inquiries, those interests are not sufficiently powerful to justify access to the President's personal papers when other sources could provide Congress the information it needs.
Second, to narrow the scope of possible conflict between the branches, courts should insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective. The specificity of the subpoena's request "serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President." Cheney , 542 U.S. at 387, 124 S.Ct. 2576.
Third, courts should be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose. The more detailed and substantial the evidence of Congress's legislative purpose, the better. See Watkins , 354 U.S. at 201, 205, 77 S.Ct. 1173 (preferring such evidence over "vague" and "loosely worded" evidence of Congress's purpose). That is particularly true when Congress contemplates legislation that raises sensitive constitutional issues, such as legislation concerning the Presidency. In such cases, it is "impossible" to conclude that a subpoena is designed to advance a valid legislative purpose unless Congress adequately identifies its aims and explains why the President's information will advance its consideration of the possible legislation. Id. , at 205-206, 214-215.
Fourth, courts should be careful to assess the burdens imposed on the President by a subpoena. We have held that burdens on the President's time and attention stemming from judicial process and litigation, without more, generally do not cross constitutional lines. See Vance, ante , --- U.S. at ---- - ----, 140 S.Ct. at 2425 - 2427 ; Clinton , 520 U.S. at 704-705, 117 S.Ct. 1636. But burdens imposed by a congressional subpoena should be carefully scrutinized, for they stem from a rival political branch that has an ongoing relationship with the President and incentives to use subpoenas for institutional advantage.
Other considerations may be pertinent as well; one case every two centuries does not afford enough experience for an exhaustive list.
When Congress seeks information "needed for intelligent legislative action," it "unquestionably" remains "the duty of all citizens to cooperate." Watkins , 354 U.S. at 187, 77 S.Ct. 1173 (emphasis added). Congressional subpoenas for information from the President, however, implicate special concerns regarding the separation of powers. The courts below did not take adequate account of those concerns. The judgments of the Courts of Appeals for the D. C. Circuit and the Second Circuit are vacated, and the cases are remanded for further proceedings consistent with this opinion.
It is so ordered.

The Court of Appeals directed a "limited" remand for the District Court to consider whether it was necessary to disclose certain "sensitive personal details" (such as documents reflecting medical services received by employees of the Trump business entities) and a "few" documents that might not relate to the committees' legislative purposes. 943 F.3d 627, 667-668, 675 (2019). The Court of Appeals ordered that all other documents be "promptly transmitted" to the committees. Id. , at 669.

By contrast, later that summer, the Judiciary was called on to resolve whether President Jefferson could be issued a subpoena duces tecum arising from Burr's criminal trial. See United States v. Burr , 25 F.Cas. 30 (No. 14,692d) (CC Va. 1807) ; see also Trump v. Vance, ante , --- U.S. ----, ---- - ----, 140 S.Ct. 2412, 2422 - 2423, --- L.Ed.2d ---- (2020).