# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 26-5072**

**September Term, 2025**

**1:25-cv-02463-JMC**

**Filed On:** May 8, 2026

Joe Neguse, in his official capacity as a
Member of the U.S. House of
Representatives, et al.,

      Appellees

    v.

U.S. Immigration and Customs Enforcement,
et al.,

      Appellants

    **BEFORE:**    Pillard, Wilkins, and Rao\*, Circuit Judges

## O R D E R

Upon consideration of the motion for a stay pending appeal, which includes a request for an administrative stay; the opposition to the request for an administrative stay; the opposition to the stay motion; the reply; and the Rule 28(j) letter and the response thereto, it is

**ORDERED** that the motion for a stay be denied. Appellants have not satisfied the stringent requirements for a stay pending appeal. See Nken v. Holder, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2025). It is

**FURTHER ORDERED** that the request for an administrative stay be dismissed as moot.

### Per Curiam

                **FOR THE COURT:**
                Clifton B. Cislak, Clerk

        BY:    /s/
               Selena R. Gancasz
               Deputy Clerk

\* A statement by Circuit Judge Rao, concurring in this order, is attached.

Rao, *Circuit Judge*, concurring: The Department of Homeland Security issued a policy requiring members of Congress to provide seven days' notice before oversight visits at immigration detention facilities. The district court stayed the policy and held that several Members of Congress have standing to challenge the denial of access to these facilities. Because the Constitution and longstanding Supreme Court precedent foreclose the Members' standing to bring this lawsuit, the government is very likely to succeed on its appeal.

While its appeal is pending, the government seeks a stay and so must establish irreparable injury from the district court's order. The government is entitled to deference on how it maintains the security of detention facilities, but the current record does not substantiate the government's claim that oversight visits without advance notice impose harms beyond administrative inconvenience. While a close call, particularly because of the strong likelihood of success on the merits, I concur in denying a stay.

I.

Appropriations for the Department of Homeland Security ("DHS") include a rider that states no funds "may be used to prevent" members of Congress or their staff "from entering, for the purpose of conducting oversight," facilities that detain aliens. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. C, § 527(a), 138 Stat. 460, 619. The rider may not "be construed to require" that members of Congress "provide prior notice of the intent to enter" a detention facility, although DHS may require congressional staff to provide twenty-four hours' notice. § 527(b)–(c).

In June 2025, Immigration and Customs Enforcement ("ICE") issued a policy that required members of Congress and their staff to provide at least seven days' notice before visiting immigration detention facilities. Soon after, twelve Members

of Congress were denied access for failing to provide advance notice. The Members sued in district court, alleging the notice policy violated the appropriations rider because DHS was using appropriated funds to prevent them from accessing the facilities without advance notice. The district court stayed the policy under section 705 of the Administrative Procedure Act. *See* 5 U.S.C. § 705.

In January 2026, the DHS Secretary reinstituted the notice policy, claiming to rely on funding from other appropriations not subject to the rider. The district court granted a temporary restraining order, but in February, after the most recent appropriation subject to the rider lapsed, the Secretary reissued an identical notice policy. The district court ultimately stayed both the January and February policies. As relevant here, the district court held the Members were likely to demonstrate standing because the rider gave them an individual right to conduct oversight at immigration detention facilities without advance notice. The government seeks a stay pending appeal.

## II.

To prevail on its motion for a stay, the government must make "a strong showing that it is likely to succeed on the merits" of its appeal, "that it will be irreparably injured absent a stay, that the balance of the equities favors it, and that a stay is consistent with the public interest." *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) (cleaned up).

In this case, the equities and the public interest are "weighty on both sides." *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024) (cleaned up). DHS has a strong interest in executing its legal obligations to maintain the security and smooth functioning of its detention facilities. Such facilities are an essential part of the Executive's enforcement of the immigration laws. But the Members are suing DHS to exercise

3

Congress's "power of inquiry," which is "an essential and appropriate auxiliary" to its legislative powers. *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (cleaned up).

Because of the important governmental interests on both sides of this interbranch conflict, entitlement to a stay turns on the first two factors. I conclude the government has made a strong showing of likelihood of success, but has not demonstrated irreparable injury on this record.

A.

The government is likely to succeed on its appeal because the Members lack standing to pursue their claims and therefore the district court had no jurisdiction to enter a stay of the notice policy.[1]

The Constitution does not authorize the Judiciary to serve as referee between Congress and the Executive Branch. Allowing the Members to vindicate Congress's legislative powers in federal court violates "fundamental constitutional principles," "upends the balance of power between Congress and the Executive, and drags courts into disputes wholly foreign to the Article III 'judicial Power.'" *Maloney v. Carnahan*, 45 F.4th 215, 221 (D.C. Cir. 2022) (Rao, J., dissenting from the denial of rehearing en banc).

As I have previously explained in detail, the text and structure of the Constitution, historical practice, and Supreme Court precedent foreclose standing for members of Congress to vindicate injuries to institutional legislative power. *Id.* at 220–33. To summarize: First, "individual members lack

---

[1] Because the Members' lack of standing is a jurisdictional defect sufficient to show the government's appeal is likely to succeed, I do not reach the merits of the Members' claims.

standing to assert the institutional interests of [the] legislature." *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 (2019). Second, when members exercise the legislative powers of their offices, they exercise the institutional power of Congress, not a personal right. Third, Congress cannot reallocate the Constitution's carefully separated powers by enacting statutes that purport to give members an individual right to vindicate legislative power through the Article III courts. *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."); *see also Maloney*, 45 F.4th at 222–23 (Rao, J., dissenting). Applying these principles, the Members have no standing to sue for alleged violations of the appropriations rider.

Mirroring this court's reasoning in *Maloney v. Murphy*, 984 F.3d 50 (D.C. Cir. 2020), the district court determined that the Members have standing because the appropriations rider confers a "personal" right to access detention facilities and obtain information about the condition of those facilities. But the Supreme Court granted certiorari and vacated *Maloney*. *Carnahan v. Maloney*, 143 S. Ct. 2653, 2653 (2023). Like the vacated decision in *Maloney*, the district court's decision contravenes *Raines* and subsequent Supreme Court decisions rejecting assertions of congressional standing.

Even assuming the appropriations rider creates some type of right for individual members to access immigration detention facilities, the frustration of that right cannot give rise to Article III standing.[2] The rider provides that the visits to the

---

[2] I doubt the appropriations rider confers a personal right on the Members. The rider provides that DHS may not spend appropriated funds to prevent members of Congress from entering detention facilities for oversight purposes. The rider provides no affirmative

facilities must be "for the purpose of conducting oversight." § 527(a). Thus, as the Members acknowledge, they assert not private rights but rather the right to exercise the official legislative powers of oversight, a right enjoyed only "by virtue of [their] office[s]." Opp'n to Stay 13. As a practical matter, the Members visit detention facilities as individual lawmakers. But conducting such investigations for oversight purposes is not a personal prerogative or right; rather, it is an exercise of the institutional power of Congress.

The appropriations rider does not alter the nature of oversight as an institutional power because Congress may not "convert the institutional legislative power of investigation into a personal right of individual legislators." *Maloney*, 45 F.4th at 229 (Rao, J., dissenting). The Supreme Court explicitly rejected such an argument in *Raines* and concluded that members of Congress lacked standing to challenge the Line Item Veto Act, even though the Act specifically authorized lawsuits by members of Congress. 521 U.S. at 815–16, 818. The Court explained that individual members lacked standing because their "claim of standing [was] based on a loss of political power, not loss of any private right."[3] *Id.* at 821.

authority for members to visit facilities. Because interpreting the statute to provide members a personalized right would fly in the face of historical practice and Supreme Court precedent, "we should not readily assume [the rider] creates the type of right and injury that is cognizable by the federal courts." *See Maloney*, 45 F.4th at 228 (Rao, J., dissenting).

[3] Following *Raines*, this circuit has recognized that members of Congress "generally may not" assert the institutional interests of Congress in federal court. *Comm. on the Judiciary of the U.S. House of Representatives v. McGahn*, 968 F.3d 755, 775 (D.C. Cir. 2020) (en banc); *see also Chenoweth v. Clinton*, 181 F.3d 112, 113 (D.C. Cir. 1999) (holding members of Congress lacked standing to challenge an executive order they claimed "denied them their proper

*Raines* makes clear that "Congress cannot delegate [its] institutional powers in a way that creates rights in individual members." *See Maloney*, 45 F.4th at 226 (Rao, J., dissenting).

This conclusion follows from the simple fact that the legislative power "is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011). Members of Congress exercise the legislative power "as trustee for [their] constituents, not as a prerogative of personal power," and injuries to such "political power" are not judicially cognizable. *Raines*, 521 U.S. at 821; *see also United States v. Ballin*, 144 U.S. 1, 7 (1892) ("The two houses of Congress are legislative bodies representing larger constituencies. Power is not vested in any one individual, but in the aggregate of the members who compose the body.").

Legislative oversight authority is not explicitly provided for in Article I but has been understood as a necessary "auxiliary to the legislative function." *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927); *see also Mazars*, 140 S. Ct. at 2031 (same). When members engage in oversight, they exercise a part of the legislative power vested in Congress. *See* U.S. Const. art. I, § 1; *Mazars*, 140 S. Ct. at 2031–32. Because the legislative power is vested in Congress as a whole, injuries to the legislative power are not the personal injuries of individual members.

"[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers." *Raines*, 521 U.S. at

---

role in the legislative process"); *Campbell v. Clinton*, 203 F.3d 19, 19–20 (D.C. Cir. 2000) (holding members of Congress lacked standing to challenge presidential actions that allegedly violated the War Powers Resolution and War Powers Clause of the Constitution).

820 (cleaned up). Particularly in disputes between the political branches, courts must be mindful of limits on their jurisdiction. The Members assert not only the right to access certain Executive Branch facilities at any time, but also the right to have disputes over access resolved by Article III courts. They cite no historical precedent for a congressional power to patrol Executive Branch facilities, let alone for lawsuits to vindicate such a power in federal court. *See id.* at 826 (finding no standing because historically, "in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury *to official authority or power*") (emphasis added).

Having the Judiciary serve as referee between the political branches "is obviously not the regime that has obtained under our Constitution." *Id.* at 828. History shows instead that oversight disputes between Congress and the Executive are generally left to the "hurly-burly, the give-and-take of the political process." *Mazars*, 140 S. Ct. at 2029. Allowing the Members to sue the Executive to vindicate oversight powers destabilizes "the Constitution's carefully calibrated structure of separated powers." *Maloney*, 45 F.4th at 231 (Rao, J., dissenting).

The Members lack standing and may not conscript the Judiciary to vindicate Congress's oversight authority in "an inter-branch dispute far afield of the traditional domain of the Article III courts." *Id.* at 233. I therefore conclude that the government is very likely to succeed on appeal.

B.

While the government is likely to succeed on appeal, it has not, on this record, met its burden to show irreparable injury from the district court's stay of the seven-day advance notice policy.

A showing of irreparable injury is "a necessary prerequisite for a stay." *KalshiEx LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024). To qualify as irreparable, the injury must be significant and incapable of being remedied "in the ordinary course of litigation." *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022). The party seeking a stay bears the burden of showing the claimed injury "is of such imminence that there is a clear and present need for equitable relief." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (cleaned up).

The government has credibly alleged inconvenience and disruption caused by congressional visits. But the government has not shown that these harms arise from congressional visits undertaken without seven days' advance notice, as opposed to congressional visits generally. The government cites a single security incident involving the unauthorized presence of the Mayor of Newark in the secured area of an ICE facility and the alleged obstruction of the Mayor's arrest by Representative McIver. But the government does not explain how this incident resulted from a lack of prior notice of the Representative's oversight visit. The appropriations rider in no way limits ICE's authority to deny entry to individuals like the Mayor who are neither members of Congress nor congressional staff.

To support its claim of irreparable injury from the lack of advance notice, the government relies on a declaration by the Acting Assistant Director of the ICE Office of Congressional Relations. The declaration asserts that "any unannounced visit is highly disruptive" because facilitating visits in a safe and orderly manner requires "additional staff attention and resources" to conduct "screening at entry" and "escorts between locked units." Hackbarth Decl. ¶¶ 8–10. Advance notice allows ICE to "allocate the staff and resources necessary to ensure these visits can take place safely." *Id.*

While I do not question the credibility of the declaration, such "generalized worries," without at least some substantiation, "do not amount to irreparable harm." *KalshiEx*, 119 F.4th at 67. The declaration does not explain how ICE operations are disrupted by unannounced visits. Without more, the government falls short of its burden to show its alleged injury is more than theoretical. *Cf. Nat'l Tr. for Historic Pres. in the U.S. v. NPS*, No. 26-5101, 2026 WL 980554, at *7 (D.C. Cir. Apr. 11, 2026) (Rao, J., dissenting) (finding irreparable injury based on "credible and detailed evidence" showing how an open construction site at the White House made it "less secure").

By contrast, the Members have provided numerous declarations attesting to congressional visits made with less than seven days' notice that were conducted without incident since 2019. The government does not meaningfully dispute these accounts and responds only that the pending litigation incentivizes the Members to conduct their visits in a nondisruptive manner. Even if that is true, this pending appeal will continue to provide the same incentives for good behavior.

Finally, I note the government has not advanced other theories of irreparable injury that might support a stay. Recent Supreme Court decisions in similar contexts suggest the government suffers irreparable injury when a lower court blocks Executive Branch action in a manner that exceeds the court's remedial powers or jurisdiction. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2561–62 (2025) (holding the government is irreparably injured when a federal court enters an "injunction[] that likely exceed[s] the authority conferred by the Judiciary Act [of 1789]"); *Trump v. Orr*, 146 S. Ct. 44, 46 (2025) (finding irreparable injury from the district court's "class-wide relief [that] enjoins enforcement of an Executive Branch policy with foreign affairs implications"); *Trump v.*

*Wilcox*, 145 S. Ct. 1415, 1416 (2025) (citing the "risk of harm from an order allowing a removed officer to continue exercising the executive power").

The district court stayed an Executive Branch policy in a lawsuit brought by several Members of Congress who lack standing. Entering a stay without jurisdiction, especially when that stay favors one political branch over the other, may constitute irreparable injury. The government, however, has not advanced such an argument, so I have no occasion to consider it here.

\* \* \*

The Members have no standing to maintain this lawsuit, so the government is very likely to succeed on the merits of its appeal. But at this stage the government has not sufficiently substantiated its claim of irreparable injury. Courts must review allegations of security risks deferentially, and it is possible there is further information about such risks that the government could present in a new stay motion. *See KalshiEx*, 119 F.4th at 67 (denying a stay but explaining that a showing of irreparable injury "is not out of reach"). With further substantiation of these harms or an explanation of why entering a stay without jurisdiction constitutes irreparable harm in this interbranch conflict, a stay may be within reach.