# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 13, 2021          Decided July 8, 2022

No. 21-5176

DONALD J. TRUMP, ET AL.,
APPELLANTS/CROSS-APPELLEES

v.

MAZARS USA, LLP AND COMMITTEE ON OVERSIGHT AND
REFORM OF THE U.S. HOUSE OF REPRESENTATIVES,
APPELLEES/CROSS-APPELLANTS

———

Consolidated with 21-5177

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:19-cv-01136)

———

*Cameron T. Norris* argued the cause for appellants/cross-appellees. With him on the briefs was *William S. Consovoy.*

*Douglas N. Letter*, General Counsel, U.S. House of Representatives, argued the cause for appellee/cross-appellant Committee on Oversight and Reform of the U.S. House of Representatives. With him on the briefs were *Todd B. Tatelman*, Principal Deputy General Counsel, *Eric R.*

*Columbus,* Special Litigation Counsel, and *Stacie M. Fahsel*, Associate General Counsel.

*Elizabeth B. Wydra* and *Brianne J. Gorod* were on the brief for *amicus curiae* Constitutional Accountability Center in support of appellee/cross-appellant.

Before: SRINIVASAN, *Chief Judge*, ROGERS and JACKSON[*], *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

Concurring opinion filed by *Circuit Judge* ROGERS.

SRINIVASAN, *Chief Judge*: In 2019, the House of Representatives' Oversight Committee issued a subpoena to then-President Trump's personal accounting firm, Mazars USA, LLP. The subpoena sought an array of the President's personal financial records covering an eight-year period. President Trump then brought this lawsuit challenging the Committee's authority to subpoena his financial records. After our court upheld the subpoena, the Supreme Court took up the matter. *Trump v. Mazars*, 140 S. Ct. 2019 (2020).

In the Supreme Court's view, our court had not adequately accounted for the weighty separation-of-powers concerns raised by a congressional subpoena for the President's personal information. The Supreme Court called for a "careful analysis" of the "separation of powers principles at stake," and enumerated "[s]everal special considerations" that should "inform th[e] analysis." *Id.* at 2035. The Court then remanded the case for an application of the framework it had set out.

---

[*] Circuit Judge, now Justice, Jackson was a member of the panel at the time the case was argued but did not participate in this opinion.

Since the time of the Supreme Court's remand, there have been two developments that potentially affect the shape of our inquiry into the subpoena's validity. First, President Trump is no longer the sitting President. And second, the Committee's chairwoman has prepared a detailed explanation of the legislative purposes the subpoena serves and of how the subpoena satisfies the test laid out by the Supreme Court.

The parties unsurprisingly disagree about the significance of those developments. In the Committee's view, both developments bolster its case for the subpoena's validity. In President Trump's view, neither development should factor into the court's analysis.

We conclude that each party is half right. We agree with President Trump that the heightened separation-of-powers scrutiny prescribed by the Supreme Court continues to govern in the unique circumstances of this case even though he is no longer the sitting President. But we agree with the Committee that we can consider its detailed accounting of the legislative purposes its subpoena serves even though that explanation came after the subpoena's original issuance.

Proceeding on that understanding, we uphold the Committee's authority to subpoena certain of President Trump's financial records in furtherance of the Committee's enumerated legislative purposes. But we cannot sustain the breadth of the Committee's subpoena. Rather, in carrying out the Supreme Court's directive to "insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective," *id.* at 2036, we determine for the following reasons that the Committee's subpoena must be narrowed in a number of respects.

4

I.

A.

In March 2019, the Chairman of the House of Representatives' Committee on Oversight and Reform, Representative Cummings, wrote to then-President Trump's personal accounting firm, Mazars USA, LLP, requesting a variety of financial information concerning the President and several of his businesses. Letter from Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Victor Wahba, Chairman and Chief Executive Officer, Mazars USA, LLP (Mar. 20, 2019). The requested material included accounting records, engagement letters, source documents, and associated communications. Mazars responded that it could not voluntarily disclose the requested information, citing federal and state regulations and professional codes of conduct protecting the confidentiality of client information. Letter from Jerry D. Bernstein, Partner, Blank Rome LLP, to Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform (Mar. 27, 2019).

In April 2019, Chairman Cummings sent a memorandum to Committee members notifying them of his intent to issue a subpoena to Mazars. Memorandum from Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Members of the Comm. on Oversight & Reform (Apr. 12, 2019) [Cummings Memorandum]. In explaining the need for the subpoena, Chairman Cummings cited testimony from President Trump's former attorney to the Committee that the President had altered the reported value of his assets in financial statements "depending on the purpose for which he intended to use the statements." *Id.* at 1. Chairman Cummings further stated that news reports had recently "raised additional

concerns regarding the President's financial statements and representations." *Id.*

In a concluding paragraph, the memorandum listed four areas that the Committee had "authority to investigate": (i) "whether the President may have engaged in illegal conduct before and during his tenure in office"; (ii) "whether he has undisclosed conflicts of interest that may impair his ability to make impartial policy decisions"; (iii) "whether he is complying with the Emoluments Clauses of the Constitution"; and (iv) "whether he has accurately reported his finances to the Office of Government Ethics and other federal entities." *Id.* at 4. The Committee's interest in those matters, the memorandum observed, "informs its review of multiple laws and legislative proposals under [its] jurisdiction." *Id.* The memorandum did not discuss or identify any specific laws or legislative proposals.

On April 15, 2019, Chairman Cummings issued the subpoena to Mazars. Subpoena to Mazars USA, LLP (Apr. 15, 2019) [2019 Subpoena]. The subpoena requires production of a variety of financial information concerning President Trump and several of his business entities spanning an eight-year period, 2011–2018.

In particular, the subpoena seeks the following documents: statements of financial condition, annual statements, periodic financial reports, and independent auditors' reports prepared, compiled, reviewed, or audited by Mazars or its predecessor. The subpoena also encompasses an array of materials associated with those core documents—i.e., all engagement agreements, source documents and records, memoranda, notes, and communications related to the preparation, compilation, or auditing of the core documents. The subpoena specifies that the information required to be disclosed pertains to "Donald J.

Trump, Donald J. Trump Revocable Trust, the Trump Organization Inc., the Trump Organization LLC, the Trump Corporation, DJT Holdings LLC, the Trump Old Post Office LLC, the Trump Foundation, and any parent, subsidiary, affiliate, joint venture, predecessor, or successor of the foregoing." *Id.*

Just days before the Oversight Committee's subpoena to Mazars, the House Financial Services Committee and Permanent Select Committee on Intelligence issued three subpoenas to Deutsche Bank and Capital One. *Mazars*, 140 S. Ct. at 2027. Those subpoenas sought financial information relating to President Trump, his children and other family members, and a number of affiliated business entities. *Id.*

B.

On April 22, 2019, President Trump, together with the affiliated organizations and entities subject to the Oversight Committee's subpoena (whom we will refer to collectively as "President Trump"), brought an action challenging the subpoena in the United States District Court for the District Columbia. *Trump v. Comm. on Oversight & Reform*, 380 F. Supp. 3d 76, 88 (D.D.C. 2019). President Trump asked the court to declare the subpoena invalid and to issue an injunction quashing it. The district court declined to do so, instead upholding the subpoena and granting summary judgment to the Committee. *Id.* at 105.

President Trump appealed to our court. We affirmed the district court's grant of summary judgment to the Committee. *Trump v. Mazars USA, LLP*, 940 F.3d 710, 714 (D.C. Cir. 2019). We acknowledged that the Committee's subpoena raised separation-of-powers concerns, but we sustained the subpoena on the ground that it rested on a legitimate legislative

purpose rather than an impermissible law-enforcement objective. *Id.* at 725–26.

President Trump also filed suit in the United States District Court for the Southern District of New York to challenge the subpoenas that had been issued by the House Financial Services and Intelligence Committees. *Trump v. Deutsche Bank AG*, No. 19-3826, 2019 WL 2204898, at \*1 (S.D.N.Y. May 22, 2019). The district court in that case denied President Trump's request for a preliminary injunction barring compliance with the subpoenas, *id.*, and the Second Circuit affirmed "in substantial part," *Trump v. Deutsche Bank AG*, 943 F.3d 627, 676 (2d Cir. 2019).

The Supreme Court granted review in both cases and consolidated them to consider "whether the subpoenas exceed the authority of the House under the Constitution." *Mazars*, 140 S. Ct. at 2029. The Court did not give a definitive answer to that question. Instead, it prescribed the framework for assessing the subpoenas' validity and remanded for application of the test it set out.

The Court explained that "a congressional subpoena is valid only if it is 'related to, and in furtherance of, a legitimate task of the Congress.'" *Id.* at 2031 (quoting *Watkins v. United States*, 354 U.S. 178, 187 (1957)). Congress thus "has power 'to secure needed information' in order to legislate," *id.* (quoting *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927)), a power that "encompasses inquiries into the administration of existing laws, studies of proposed laws, and 'surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them,'" *id.* (quoting *Watkins*, 354 U.S. at 187). Consequently, "[w]hen Congress seeks information 'needed for intelligent legislative action,' it

'unquestionably' remains 'the duty of *all* citizens to cooperate.'" *Id.* at 2036 (quoting *Watkins*, 354 U.S. at 187).

But "[c]ongressional subpoenas for information from the President," the Court explained, "implicate special concerns regarding the separation of powers." *Id.* That does not mean that "the House must establish a 'demonstrated, specific need' for the financial information" it seeks in the subpoenas at issue, or that it "must show that the financial information is 'demonstrably critical' to its legislative purpose." *Id.* at 2032 (citations omitted). Those strict standards "would risk seriously impeding Congress in carrying out its responsibilities." *Id.* at 2033. At the same time, though, it is not enough for the House to show merely that the President's financial information "could potentially 'relate to' a conceivable subject of legislation." *Id.* at 2034. "Without limits on its subpoena powers, Congress could 'exert an imperious controul' over the Executive Branch and aggrandize itself at the President's expense, just as the Framers feared." *Id.* (citations omitted).

Accordingly, a "balanced approach is necessary," one that "takes adequate account" of "both the significant legislative interests of Congress and the unique position of the President." *Id.* at 2035 (quotation marks omitted). The Court enumerated four "special considerations" that should "inform [the] analysis" of whether "a subpoena directed at the President's personal information is 'related to, and in furtherance of, a legitimate task of the Congress.'" *Id.* (quoting *Watkins*, 354 U.S. at 187).

First, "courts should carefully assess whether the asserted legislative purpose warrants the significant step of involving the President and his papers." *Id.* Congress "may not rely on the President's information if other sources could reasonably

provide Congress the information it needs in light of its particular legislative objective." *Id.* at 2035–36. Second, "courts should insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective." *Id.* at 2036. Third, Congress must "adequately identif[y] its aims and explain[] why the President's information will advance its consideration of the possible legislation." *Id.* Fourth, "courts should be careful to assess the burdens imposed on the President by a subpoena." *Id.* And those considerations, the Court observed, are not "an exhaustive list"—"[o]ther considerations may be pertinent as well." *Id.*

The Court remanded the cases before it "for further proceedings consistent with [its] opinion." *Id.*

## C.

When the challenge to the Oversight Committee's subpoena to Mazars came back to our court after the Supreme Court's remand, we requested supplemental briefing from the parties. *Trump v. Mazars USA, LLP*, 832 F. App'x 6, 7 (D.C. Cir. 2020). As an attachment to its brief, the Committee submitted a 58-page memorandum prepared by Chairman Cummings's successor, Chairwoman Carolyn Maloney, which had been circulated to the Committee's members in August 2020. Memorandum from Carolyn B. Maloney, Chairwoman, House Comm. on Oversight & Reform, to Members of the Comm. on Oversight & Reform (Aug. 26, 2020) [First Maloney Memorandum], https://tinyurl.com/34by2cpe.

The First Maloney Memorandum set forth the Committee's need for the materials encompassed by the Mazars subpoena in far greater detail than had any previous communication. The memorandum described "the status of the Committee's investigations and potential legislative reforms

that would be advanced by the Mazars subpoena," and sought to "explain[] why the Committee's subpoena satisfies the Supreme Court's new four-factor analysis for evaluating Congress's need for the President's personal information." *Id.* at 1.

According to the Committee, President Trump's "actions have exposed glaring weaknesses in current ethics legislation that threaten the accountability and transparency of our government." *Id.* at 3. And the Committee has "determined that Mazars is in possession of documents and information necessary to help the Committee define areas that require remedial measures and undertake the necessary legislative reforms." *Id.* at 5.

The memorandum described the Committee's investigations as generally "aimed at defining, understanding, and mitigating presidential conflicts of interest and self-dealing and enabling the Committee to develop and pass necessary and effective reforms in presidential ethics and related agency oversight." *Id.* The Committee categorized its ongoing investigations in "three tracks relating to": (i) "presidential conflicts of interest and financial disclosures"; (ii) "presidential contracts with the federal government and potential self-dealing"; and (iii) "presidential adherence to the Emoluments Clauses" of the Constitution. *Id.* at 4.

The first track, the "financial disclosures track," involves investigation of "President Trump's federal financial disclosures to the Office of Government Ethics (OGE), in order to pass legislation to ensure presidential financial disclosures include sufficiently detailed information to assess potential conflicts of interest, close loopholes in the financial disclosure process, and strengthen OGE." *Id.* at 4–5. The second track, the "GSA lease track," involves investigation of "President

Trump's lease agreement with the General Services Administration (GSA) for the Trump Old Post Office Hotel, in order to pass legislation to ensure that GSA administers federal contracts with the President in a fair and transparent manner, prevent future presidents from engaging in and maintaining self-dealing contracts with the U.S. government, and close loopholes in government contracting." *Id.* at 5. The third track, the "emoluments track," involves investigation of "President Trump's receipt of funds from foreign governments, federal officials, or state officials through his business holdings," with an aim of "passing legislation to prohibit taxpayer funds from flowing to the President's businesses, strengthen disclosure requirements to ensure compliance with the Emoluments Clauses, enable Congress to identify noncompliance and conflicts of interest involving foreign governments, and consider other potential remedies for specific conflicts of interest as they are identified." *Id.*

The First Maloney Memorandum set out in substantial detail the basis for the Committee's concerns under each of those three investigative tracks, the legislative measures under consideration, and the Committee's justifications for seeking the subpoenaed information under each of the four factors enumerated by the Supreme Court. The memorandum closed by noting the Committee's intention to continue its investigations into "the next Congress, regardless of who holds the presidency, because the Committee's goal is to prevent problems raised by the circumstances of the current President from being repeated." *Id.* at 55. In view of the Committee's intent to reissue the subpoena at the beginning of the next Congress (which was close at hand), and of the Committee's reliance on the First Maloney Memorandum (which had not been considered before), we remanded the case to the district court for further proceedings consistent with the Supreme Court's opinion. 832 F. App'x at 7.

Although the Committee responded to the Supreme Court's decision with a memorandum substantially elaborating on its explanation of the legislative need for the Mazars subpoena, the Committee did not reduce the range of documents encompassed by the subpoena. The two other House Committees whose subpoenas were also before the Supreme Court, by contrast, significantly narrowed the scope of their requests for President Trump's financial information in the wake of the Court's decision. The Financial Services Committee withdrew its subpoena to Capital One altogether and indicated its intention to narrow its subpoena to Deutsche Bank to reach "only records that do not constitute the President's information." Letter from Douglas N. Letter, General Counsel, U.S. House of Representatives, at 2, *Trump v. Deutsche Bank AG*, No. 19-1540 (2d Cir. Aug. 26, 2020). The Intelligence Committee limited its own subpoena to Deutsche Bank to reach only the records of key account holders; reduced the subpoena's date range; and confined most of the subpoenaed documents to ones related to "any financial relationships, transactions, or ties between any of the Covered Parties and any foreign individual, entity, or government." *See* Memorandum from Adam B. Schiff, Chairman, House Permanent Select Comm. on Intel., to Members of the Permanent Select Comm. on Intel. 11–12 (Aug. 25, 2020), https://perma.cc/JR8G-ZHY4 [Schiff Memorandum].

D.

On January 3, 2021, shortly after this case returned to the district court for application of the Supreme Court's framework to the Mazars subpoena, the 117th Congress commenced. On February 23, 2021, Chairwoman Maloney circulated a memorandum notifying Committee members of her intent to reissue the Mazars subpoena. Memorandum from Carolyn B. Maloney, Chairwoman, House Comm. on Oversight *&*

Reform, to Members of the Comm. on Oversight & Reform (Feb. 23, 2021) [Second Maloney Memorandum]. By that time, President Trump was no longer the sitting President.

In setting forth the basis for reissuance of the Mazars subpoena, the Second Maloney Memorandum explained that the Committee would continue its inquiries across the three investigative tracks in the new Congress. *Id.* at 3. The memorandum stated that "Donald Trump's unprecedented actions as President" had "laid bare several apparent weaknesses and gaps in the laws and regulations governing presidential financial disclosure, conflicts of interest, and emoluments." *Id.* "The subpoenaed information from Mazars," the memorandum observed, would "allow the Committee and Congress to more fully identify the areas that need reform and craft appropriate legislation in response." *Id.* The memorandum also incorporated and attached the First Maloney Memorandum. *Id.* at 4. On February 25, 2021, two days after circulation of the Second Maloney Memorandum, the Committee reissued the Mazars subpoena without alteration. Subpoena to Mazars USA, LLP (Feb. 25, 2021) [2021 Subpoena].

President Trump and the Committee later filed cross-motions for summary judgment in the district court proceedings. The district court granted in part and denied in part each party's motion. *Trump v. Mazars USA LLP*, 560 F. Supp. 3d 47, 51 (D.D.C. 2021). The court first held that it would consider the First Maloney Memorandum even though it had been prepared after the original issuance of the subpoena. *Id.* at 59–60. The court then rejected the Committee's argument that, because President Trump was no longer the sitting President, the separation-of-powers concerns undergirding the Supreme Court's framework in its *Mazars* opinion were no longer applicable. *Id.* at 64–65. But the court

set out to apply "the *Mazars* factors cognizant of the fact that this case now involves a subpoena directed at a former President," which, to the court, called for application of a measure of reduced scrutiny. *Id.* at 65–66.

The court then carefully applied that framework to each of the three investigative tracks relied on by the Committee. The court's thoughtful analysis led it to hold that the financial disclosures track could not justify any portion of the subpoena; that the GSA lease track could justify the subpoena but only as to those documents belonging to President Trump himself, Trump Old Post Office LLC, and the Trump Organization (which the court viewed to be the only parties associated with the GSA lease of the Old Post Office site for the Trump International Hotel); and that the emoluments track could support the subpoena for all requested documents but only for the requested years during which President Trump was in office, 2017–2018. *Id.* at 66–81.

## II.

President Trump and the Committee both appeal from the district court's decision. Whereas the district court upheld the Committee's subpoena while narrowing its reach to encompass certain parties and certain years, President Trump and the Committee press competing all-or-nothing positions in our court: President Trump contends that the subpoena should be invalidated in its entirety, and the Committee submits that the subpoena should be sustained in full.

We review the district court's summary-judgment decision de novo. *Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218, 222 (D.C. Cir. 2000). We uphold the Committee's authority to subpoena President Trump's financial information, but we

15

narrow the scope of the Committee's subpoena somewhat more than did the district court.

A.

We begin by addressing our jurisdiction. Because Article III of the Constitution grants federal courts power to resolve "actual, ongoing controversies," we lose jurisdiction if a pending case becomes moot. *Planned Parenthood of Wis., Inc. v. Azar*, 942 F.3d 512, 516 (D.C. Cir. 2019). And a case is moot if intervening events mean that the court's "decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (citation omitted).

Generally, the "initial 'heavy burden' of establishing mootness lies with the party asserting a case is moot." *Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010) (citation omitted). Neither the Committee nor President Trump suggests on appeal that this case is moot, so neither, of course, has carried that heavy burden. But we also "have an 'independent obligation' to ensure that appeals before us are not moot." *Planned Parenthood of Wis.*, 942 F.3d at 516 (citation omitted).

When this case was last before us, the 116th Congress was about to end, and the Committee had expressed its intention to reissue its subpoena to Mazars in the new Congress. In remanding the case to the district court, we "express[ed] no view as to whether this case will become moot when the subpoena expires" at the end of the 116th Congress. 832 F. App'x at 7.

The case then returned to the district court, and the Committee reissued the subpoena without modification. President Trump did not amend his complaint to challenge the reissued subpoena. In the parties' summary-judgment briefing, they agreed that President Trump's challenge to the original subpoena had not become moot. Both parties relied on a House Rule permitting congressional committees to "act as the successor in interest" to the committees of a prior Congress in order to "ensure continuation of" litigation, including by reissuing subpoenas. House Rule II.8(c); *see* Trump Mot. for Summ. J. at 12, *Mazars USA LLP*, 560 F. Supp. 3d 47 (No. 19-cv-01136), ECF No. 54; Comm. Cross-Mot. for Summ. J. at 20, *Mazars USA LLP*, 560 F. Supp. 3d 47 (No. 19-cv-01136), ECF No. 55.

We agree with the parties that the current Committee's ability to act as a successor in interest keeps the dispute over the original subpoena alive. The House Rule on which the parties rely permits the current Committee to continue litigation started during the prior Congress and explicitly authorizes the Committee to reissue subpoenas as necessary to extend the litigation. House Rule II.8(c); *see also Comm. on Judiciary v. Miers*, 542 F.3d 909, 912 (D.C. Cir. 2008) (Tatel, J., concurring); *United States v. AT&T Co.*, 567 F.2d 121, 124 (D.C. Cir. 1977). The present Committee thus can act as the successor to the prior Committee's interest in enforcing the original subpoena, saving the case from mootness notwithstanding the expiration of the 116th Congress. The Supreme Court has analogously held that a plaintiff's death does not moot a case when his estate as successor can recover money that would have been owed to him. *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 630 (1984); *see Sinito v. U.S. Dep't of Just.*, 176 F.3d 512, 515–16 (D.C. Cir. 1999); *see also* Fed. R. Civ. P. 25(d). And insofar as the original subpoena in this case expired upon the adjournment of the 116th Congress,

*see United States v. AT&T Co.*, 551 F.2d 384, 390 (D.C. Cir. 1976), the Committee reissued the same subpoena in the 117th Congress as part of its effort to act as a "successor in interest" to enable "continuation of" the litigation. House Rule II.8(c).

At any rate, even assuming the original subpoena expired and that had the effect of mooting the challenge, we still would retain jurisdiction because a mootness exception would govern. A court can decide an otherwise-moot matter if the dispute is capable of repetition yet evading review. That mootness exception applies if "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration" and "there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam). The potential for recurrence must be of the "precise controversy" between the parties. *Planned Parenthood of Wis.*, 942 F.3d at 517 (citation omitted).

Those conditions exist here. Assuming the Committee's original subpoena expired upon adjournment of the 116th Congress, that happened before the case could be fully litigated. Many such disputes would be likely to evade review given that subpoena litigation might well remain pending at the end of a two-year session of Congress. And here, there is more than just a reasonable expectation that the Committee would reissue the same subpoena. It has already done so. *Cf. Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 362 (D.C. Cir. 2018). In fact, the Committee reissued the exact same subpoena for the express purpose of preventing this case from becoming moot. The "precise controversy" over the Committee's subpoena for Mr. Trump's personal accounting records thus is capable of repetition yet evading review. *Planned Parenthood of Wis.*, 942 F.3d at 517 (citation omitted).

We have employed similar reasoning in analyzing whether a challenge to a contempt order for failure to comply with a grand jury subpoena becomes moot following expiration of the issuing grand jury. *In re Sealed Case*, 877 F.2d 976, 981 n.6 (D.C. Cir. 1989). We explained that such challenges fall within the "capable of repetition but evading review" exception to the mootness doctrine. A "grand jury's term and its investigations are by their very nature of limited and relatively short duration," making it difficult to adjudicate contempt issues before dissolution of the jury. *Id.* (quoting *In re Grand Jury Proceedings (Larson)*, 785 F.2d 629, 631 (8th Cir. 1986)); *see also In re Grand Jury Proceeding*, 971 F.3d 40, 51, 53 (2d Cir. 2020). The same logic applies to congressional subpoenas. We thus have jurisdiction to reach the merits of this appeal even if the challenge to the original subpoena is moot.

B.

Having determined that we retain jurisdiction to consider President Trump's challenge to the Committee's subpoena, we next consider by which test we should assess whether the subpoena "is related to, and in furtherance of, a legitimate task of the Congress." *Mazars*, 140 S. Ct. at 2035 (quotations omitted). One might wonder why that is even a question—after all, the Supreme Court already set out the framework that should govern the inquiry in this case and directed us to apply it on remand.

In the Committee's view, though, the test prescribed by the Supreme Court in this case should no longer govern our analysis. That test, to the Committee, rested on the heightened separation-of-powers concerns raised by a congressional subpoena issued to a *sitting* President. But because President Trump is now a former President, the Committee argues, a more relaxed standard should control. The Committee thus

urges us to set aside the four-factor inquiry set forth by the Supreme Court in this case and instead weigh "the Committee's need for the subpoenaed materials for its legislative purposes against the limited intrusion on the Presidency when Congress seeks a former President's information." House Br. 62. The Committee derives that standard from *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), which rejected a former President's challenge to a statute enabling the General Services Administration to take custody of his presidential records. *Id.* at 430.

We do not accept the Committee's invitation to abandon the Supreme Court's *Mazars* test in the *Mazars* case itself. Whatever may be the appropriate standard when Congress issues a subpoena to a former President, the subpoena in this case, when issued, sought a sitting President's information. President Trump then brought this challenge while still in office; that same challenge remains pending; and the subpoena remains unchanged in all respects. At least in these specific circumstances, we do not understand that the *Mazars* test instantly ceased to apply—and a different standard immediately took hold—on the day President Trump left office. The ongoing litigation otherwise remained the same.

True, separation-of-powers interests on the President's side of the ledger may be "subject to erosion over time after an administration leaves office." *Nixon v. GSA*, 433 U.S. at 451. But as we recently explained, "if there were no limits to Congress's ability to drown a President in burdensome requests the minute he leaves office, Congress could perhaps use the threat of a post-Presidency pile-on to try and influence the President's conduct while in office." *Trump v. Thompson*, 20 F.4th 10, 44 (D.C. Cir. 2021). Congress thus could wield the threat of intrusive post-Presidency subpoenas to influence the actions of a sitting President "for institutional advantage."

*Mazars*, 140 S. Ct. at 2036. And here, the Committee specifically made known, while President Trump remained in office, that the Committee "fully intend[ed] to continue [its] investigation . . . in the next Congress, regardless of who holds the presidency." First Maloney Mem. 55.

We note, lastly, that the person "who holds the presidency," President Biden, has not opposed former President Trump's efforts to challenge the Committee's subpoena. Indeed, the last word of the Executive Branch in this case, filed in our court on remand from the Supreme Court, was to argue that the subpoena must be invalidated under the *Mazars* test. Brief for the United States as Amicus Curiae at 8–15, *Mazars*, 832 F. App'x 6 (No. 19-5142). The circumstances here thus are unlike those we recently faced in *Trump v. Thompson*. There, former President Trump's attempt to assert executive privilege to prevent a House Committee from obtaining presidential records relating to the events of January 6, 2021, conflicted with President Biden's considered judgment that "Congress has demonstrated a compelling need for [the] documents and that disclosure is in the best interests of the Nation." *Thompson*, 20 F.4th at 32.

In its order denying a stay application in that case, the Supreme Court specifically left open the question whether President Trump's status as a former President could make any difference to his ability to assert executive privilege. *See* Order Denying Application for Stay 1–2, *Trump v. Thompson*, No. 21A272 (Sup. Ct. Jan. 19, 2022). The possibility that President Trump's ability to assert executive privilege may be unaffected by his status as a former President—even in the face of the sitting President's opposition—gives us all the more reason to conclude here that the test governing President Trump's challenge is unaffected by his departure from office during the litigation.

In short, we will apply the *Mazars* test to the Mazars subpoena.

## C.

Having concluded that the *Mazars* test continues to govern in this case, we next assess what evidence we may consider in conducting the inquiry. In particular, are we confined to considering only those materials in existence at the time of the subpoena's original issuance—chiefly, Chairman Cummings's three-and-a-half-page memorandum outlining his intent to issue the subpoena? Or, may we also consider the later memoranda prepared by Chairwoman Maloney? Those memoranda set out the legislative purposes served by the subpoena in far greater detail than any previous document— the First Maloney Memorandum alone spans some 58 pages. We conclude that we can (and should) consider the Maloney Memoranda.

Those memoranda best set forth the Committee's understanding of its legislative purposes and how the subpoenaed documents would inform the Committee's (and Congress's) legislative work. We cannot lightly cast aside a coordinate branch of government's most fulsome explanation for its actions, and we are reluctant to disregard a source so pertinent to our inquiry—particularly when the Committee reincorporated that explanation when reissuing the subpoena at the start of the new session of Congress.

The memoranda are especially valuable because they respond to the Supreme Court's new test for evaluating congressional subpoenas to the President. Before the Supreme Court's decision in this case, the Court had "never addressed a congressional subpoena for the President's information"—this case was "the first of its kind to reach [the] Court." *Mazars*,

140 S. Ct. at 2026, 2031. The First Maloney Memorandum directly responded to the Supreme Court's decision by setting out how the subpoena satisfies the test newly announced by the Court, including the Court's prescription that the "more detailed and substantial the evidence of Congress's legislative purpose, the better." *Id.* at 2036. We see no indication that the detailed accounting of the legislative purposes set forth in the memoranda is ingenuine in any respect. And because President Trump has had ample opportunity to review the memoranda and respond to their contents, there is no cognizable prejudice to him from our considering them.

Our consideration of the Maloney Memoranda is consistent with our decisions. In *Senate Select Committee v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc), we declined to enforce a subpoena the Senate issued for taped conversations between President Nixon and his counsel, John W. Dean, III. *Id.* at 726, 733. We observed that "the Judiciary Committee now has in its possession copies of each of the tapes subpoenaed by the Select Committee" such that "the Select Committee's immediate oversight need for the subpoenaed tapes is, from a congressional perspective, merely cumulative." *Id.* at 732. *Senate Select* thus supports our consideration of post-subpoena developments in evaluating the need for a subpoena. It is especially appropriate for us to consider a post-subpoena explanation for Congress's actions because that explanation provides the most relevant basis on which to evaluate Congress's purposes.

President Trump dismisses the Maloney Memoranda as "a post-hoc litigation strategy," rather than "an actual statement of purpose." Trump Reply Br. 30. But the Maloney Memoranda predated the subpoena's reissuance in 2021, so it seems apparent that we would not reject those memoranda as post-hoc in a standalone challenge to the reissued subpoena.

And the only reason we are not now presented with such a challenge is that President Trump never amended his complaint after the subpoena's reissuance. By President Trump's own admission, that was a deliberate choice: he believes that the all-but-automatic substitution of the identical, reissued subpoena is "why this case never became moot" and "why [he] didn't need to amend [his] complaint." Trump Br. 26. In those circumstances, we see no sound reason why President Trump's own litigation choices in declining to amend his complaint should preclude us from considering the most useful evidence of Congress's purposes in issuing and then reissuing the subpoena—the Maloney Memoranda.

President Trump further contends that the legality of congressional requests for information must be evaluated at the time the subject objects, which occurred here well before the circulation of the Maloney Memoranda. But the criminal cases on which President Trump relies for that proposition are off point. Those cases involve convictions for criminal contempt arising from a witness's refusal to answer a congressional committee's questions. *See Watkins*, 354 U.S. at 182; *United States v. Rumely*, 345 U.S. 41, 42 (1953); *Shelton v. United States*, 327 F.2d 601, 602 (D.C. Cir. 1963). In that context, a committee must state why its questions pertain to the subject under inquiry "upon objection of the witness on grounds of pertinency." *Watkins*, 354 U.S. at 214. If a witness is denied a fair opportunity to determine whether she may permissibly refuse to answer Congress's questions, her conviction for criminal contempt is invalid under the Due Process Clause. *Id.* at 215. In that way, the requirement that congressional requests be judged "upon objection" protects the due process-based notice rights of congressional witnesses. No such concerns are at play here.

For those reasons, we will consider the Maloney Memoranda in our analysis.

D.

We turn now to applying the *Mazars* test to the Committee's subpoena, as supported by the explanation set forth in the Maloney Memoranda. Article I of the Constitution vests federal legislative power in Congress. U.S. Const. art. I, § 1. Congressional subpoenas, issued in furtherance of the legislative function, thus "must serve a 'valid legislative purpose.'" *Mazars*, 140 S. Ct. at 2031 (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)). Congress's subpoena power "encompasses inquiries into the administration of existing laws" and "studies of proposed laws." *Id.* The "congressional power to obtain information" for those legislative purposes "is 'broad' and 'indispensable.'" *Id.* (quoting *Watkins*, 354 U.S. at 187, 215).

But because congressional subpoenas must serve valid legislative purposes, "Congress may not issue a subpoena for the purpose of law enforcement," a non-legislative function "assigned under our Constitution to the Executive and the Judiciary." *Id.* at 2032 (citation and quotation marks omitted). Nor is there a general congressional power simply "to inquire into private affairs and compel disclosures," to "expose for the sake of exposure," or to conduct investigations "solely for the personal aggrandizement of the investigators or to punish those investigated." *Id.* at 2032 (citation and quotation marks omitted).

The overarching question is whether a congressional subpoena "is 'related to, and in furtherance of, a legitimate task of the Congress.'" *Id.* at 2031 (quoting *Watkins*, 354 U.S. at 187). When, as here, the subpoena seeks "the President's

personal information," the circumstances also "implicate weighty concerns regarding the separation of powers." *Id.* at 2035. Consequently, in assessing whether such a subpoena relates to and furthers a legitimate congressional task, "[s]everal special considerations inform [the] analysis." *Id.* The Supreme Court enumerated four specific factors that courts must take into account, while noting that "other considerations may be pertinent as well." *Id.* at 2035–36.

First, "courts should carefully assess whether the asserted legislative purpose warrants the significant step of involving the President and his papers." *Id.* at 2035. In particular, Congress may not obtain a President's information "if other sources could reasonably provide Congress the information it needs in light of its particular legislative objective." *Id.* at 2035–36. Second, assuming Congress shows the requisite need for at least some of the President's information, courts must "insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective." *Id.* at 2036. Tailoring the scope of the subpoena to Congress's specific legislative proposals "serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President." *Id.* (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 387 (2004)).

So explained, the first and second factors work in tandem: together, they ask whether there is a reasonable need for any presidential information in furtherance of a legitimate legislative objective, and, if so, how much. It follows that a subpoena justifying Congress's need for some but not all of the information sought from a President would satisfy the first factor but not the second. Such a subpoena would be enforceable only in part, with Congress able to obtain only those records reasonably necessary to support its legislative ends.

While the first two factors address the permissible scope of a congressional subpoena directed to a President's personal information, the third factor calls for courts to "be attentive to the nature of the evidence offered by Congress to establish that [such] a subpoena advances a valid legislative purpose." *Id.* at 2036. That factor assesses the extent to which Congress has explained itself: "The more detailed and substantial the evidence of Congress's legislative purposes"—i.e., the less "vague and loosely worded [the] evidence of Congress's purpose"—"the better." *Id.* (citation and quotation marks omitted). The third factor thus asks whether Congress has put forward a sufficiently detailed explanation of the legislative need to involve the President's papers, whereas the first and second factors call for a substantive assessment of whether—and to what degree—those reasons hold together to support the subpoena.

The fourth *Mazars* factor shifts the focus from Congress's explanation for the subpoena to "the burdens imposed on the President by a subpoena." *Id.* Those burdens, the Court explained, "should be carefully scrutinized, for they stem from a rival political branch that has an ongoing relationship with the President and incentives to use subpoenas for institutional advantage." *Id.*

In applying those four factors to the Committee's subpoena, we take them up in the same order as President Trump does in his briefing to us. We start with the third factor and assess the extent to which the Committee has explained its legislative purposes and the connection between those purposes and President Trump's financial information. Like the parties, we consider that question by reference to the three investigative tracks set out in the Maloney Memoranda. After inventorying the Committee's accounting of its need for the subpoenaed information under the third *Mazars* factor, we

examine, under the first two factors, the degree to which those legislative purposes justify involving President Trump's information. Finally, we consider, under the fourth factor, the burdens the subpoena imposes on President Trump.

We conclude that the Committee has adequately shown that its legislative objectives support involvement of President Trump's financial information in some measure. But we determine that the subpoena is unduly broad by reference to those legislative purposes. None of the three investigative tracks—nor the three tracks considered in combination—can sufficiently justify the sweep of the subpoena. We thus narrow the subpoena in several respects. Finally, we conclude that the subpoena, as narrowed, does not impose an intolerable burden on President Trump.

1.

In presenting his arguments under the four *Mazars* factors, President Trump begins with the third one. Trump Br. 37–38. We start there as well. That factor calls for us to examine the extent to which the Committee has described its legislative purposes and how the subpoenaed information would advance those purposes. After assessing the adequacy of Congress's explanation in those respects, we can then consider, under the first and second factors, the degree to which Congress's stated purposes in fact support obtaining the presidential information covered by the subpoena.

In applying the third *Mazars* factor, we ask whether the "evidence of Congress's legislative purpose" is "detailed and substantial," or whether it is instead merely "vague and loosely worded." *Id.* (citation and quotation marks omitted). And when, as in this case, "Congress contemplates legislation . . . concerning the Presidency," it will be "impossible to conclude

that a subpoena is designed to advance a valid legislative purpose unless Congress adequately identifies its aims and explains why the President's information will advance its consideration of the possible legislation." *Id.* (citation and quotation marks omitted).

Here, we conclude that the Committee has adequately described its legislative aims and sufficiently set forth how, in its view, the subpoenaed information will further its consideration of potential legislation. The Committee's explanation is "detailed and substantial." *Id.* In fact, the First Maloney Memorandum contains more than fifty pages of explanation addressed to those subjects. The memorandum organizes that explanation by reference to three investigative tracks identified by the Committee: (i) Presidential financial disclosures, (ii) Presidential contracts with the government (the "GSA lease track"), and (iii) Presidential emoluments. The parties' arguments in their briefing follow that same approach, and we will do so as well.

a.

Again following the order in which President Trump presents his arguments, we begin with the emoluments track. Trump Br. 36. The Committee has adequately identified its legislative aims related to emoluments. That track of the Committee's investigation concerns potential legislation requiring Presidents to report payments from foreign and domestic governments while in office. First Maloney Mem. 23–24. The Constitution's Foreign Emoluments Clause bars federal officials (including the President) from accepting gifts or other payments from foreign governments. U.S. Const. art. I, § 9, cl. 8. The Domestic Emoluments Clause applies solely to the President and prohibits the acceptance of gifts or other

payments from state governments or federal agencies. U.S. Const. art. I, § 1, cl. 7.

The Committee points to reports that, during President Trump's tenure in office, foreign and domestic governments continued to make payments to his businesses. *Id.* at 24, 28–29. And the Committee explains that it is considering various legislative proposals related to the Emoluments Clauses in response, including bills that would require federal agencies to report spending at a President's businesses or require reimbursement of taxpayer dollars spent at a President's properties. *Id.* at 30.

The Committee has also adequately explained how the information it seeks about President Trump's receipt of emoluments will advance its consideration of the potential legislation. The Committee has compiled reports that officials from many countries spent substantial sums at President Trump's properties during his Presidency. *Id.* at 24–25. The Committee observes that its legislative proposals aim to address the "significant constitutional issues" raised by President Trump's alleged "refusal to adhere to the Emoluments Clauses of the United States." *Id.* at 30. To address those specific issues, the Committee explains, it requires his information.

For instance, the Committee notes that audited statements from the Trump International Hotel "may include important descriptive information about sources of payments and cash flows related to foreign and domestic government payments, which will inform Congress's consideration of whether and what information presidents should report upon receipt of an emolument to preserve Congress's constitutional role in accepting or rejecting them." *Id.* at 49. The Committee further explains that the former President's financial statements and

source documents "may show the tangible and intangible benefits" he received, and how his businesses "have recorded, or failed to record, payments from" foreign and domestic government sources. *Id.* The Committee believes that information would inform its consideration of legislation addressing "the type of expenses that must be reported as foreign emoluments." *Id.* at 50. And the Committee suggests that the subpoenaed information could "provide evidence . . . that legislation is needed," which could in turn win the support of legislators who might otherwise doubt that President Trump's holdings gave rise to ethical concerns. *Id.* at 31.

We thus conclude that the Committee has explained in adequate detail how President Trump's papers will inform its legislative aims under the emoluments track. We will examine the extent to which the Committee's explanation in fact supports obtaining President Trump's papers when we turn to the first and second *Mazars* factors.

b.

We now apply the third *Mazars* factor to the GSA lease track of the Committee's investigation. That investigative track concerns potential legislation to prevent Presidents from contracting with the federal government while in office or to provide for greater oversight of such contracts. The Committee identifies several potential legislative initiatives in that area. The Committee is considering legislation to "remediat[e] the obvious conflicts of interest that arise when the President or his businesses enter into a private contract with the United States or any of its agencies." *Id.* at 23. One bill, H.R. 1, would prohibit contracts between the United States or its agencies and the President. *Id.* Other proposals include "independent auditing of contracts that involve the President" and mandated submission of audited financial documentation from

leaseholders "who may be able to exert undue influence on GSA." *Id.*

The Committee also has explained in adequate detail how President Trump's information will advance those legislative aims. Each legislative proposal fitting under the GSA lease track responds to concerns that President Trump's continuation while in office of the lease of the Old Post Office for the Trump International Hotel violated the lease's terms and presented a conflict of interest. Those proposals seek to remediate issues identified by the Committee, including alleged mismanagement of the lease and indications that, in the Committee's view, GSA may have been "unduly influenced by President Trump." *Id.*

The Committee thus believes that the audited financial statements of Trump Old Post Office LLC—the Trump International Hotel's holding company—"are relevant to President Trump's conflicts of interest in the lease and GSA's management of those conflicts," as well as to emoluments concerns related to the hotel. *Id.* at 49. The Committee explains that President Trump's rent payments for the Old Post Office were "based on key financial figures that he submit[ted] in his audited financial reports." *Id.* If the Committee were to obtain that information, it "could craft more tailored legislative reforms to ensure that proper rents are collected and taxpayer interests are protected." *Id.* The Committee also believes that audited hotel statements could reveal emoluments President Trump received through the Trump International Hotel, aiding the Committee in determining what information must be reported upon receipt of such payments. *Id.* For instance, the Committee explains, if foreign governments paid above-market rates at the hotel, the Committee would consider legislative reforms capturing such payments in the President's reporting of emoluments. *Id.* at 51.

In light of that explanation, we conclude that, on the GSA lease track, too, the Committee has adequately identified its legislative objectives and explained in sufficient detail why President Trump's financial records would advance its consideration of potential legislation.

c.

Lastly, we apply the third *Mazars* factor to the financial disclosures track of the Committee's investigation. That track relates to possible amendments to the Ethics in Government Act, as well as other proposed ethics legislation identified by the Committee. As previously mentioned, the House has already passed H.R. 1, a "sweeping bill" that "includes a number of reforms that will strengthen accountability for executive branch officials—including the President." *Id.* at 12 (citation omitted). Provisions of that bill would require the President to divest from certain financial holdings posing potential conflicts of interest and to disclose financial interests exceeding $10,000. *Id.* at 12–13. The bill would also require candidates for President and Vice President to disclose ten years of federal tax returns to the Federal Election Commission. *Id.* at 13. Other proposed legislation concerns "what additional information Congress should require presidents and presidential candidates to disclose about their financial holdings," including whether to extend the covered time period for disclosures or to require submission of supporting documents. *Id.* at 13–14.

The Committee also has adequately explained how President Trump's financial information would inform its disclosure-related legislative objectives. Each of the above proposals responds to the Committee's investigation of President Trump's financial disclosures, during which the Committee amassed detailed evidence of suspected

misrepresentations and omissions in his required disclosure forms. Alleged ethical issues identified in President Trump's disclosures include undisclosed payments sent to his attorney and "numerous apparent discrepancies" between his first federal financial disclosures in 2015 and records provided to the Committee. *Id.* at 11. The Committee explains that the President's information would help it determine "what additional information should be disclosed to provide a more accurate and complete picture" of future Presidents' or presidential candidates' finances and potential conflicts of interest—"and close any loopholes." *Id.* at 44–45.

The Committee also anticipates that President Trump's information will reveal connections between his business entities that are not currently subject to disclosure, which would aid the Committee in updating the financial disclosure requirements "to reflect the true ownership structure of businesses" held by future Presidents. And the Committee explains that President Trump's accounting records would assist in "identifying new sources of wealth, their fluctuations, and the underlying causes," so that the Committee can "assess the need for ethics reforms, including whether and how to require reporting of new assets, debts, or income, such as prospective foreign deals . . . and other monetized relationships." *Id.* at 44. Additionally, if President Trump's information reveals that any identified discrepancies were merely a mistake, the Committee could "mandate additional instructions or reporting requirements," whereas if such discrepancies were intentional, Congress could require the submission of "supporting financial information." *Id.* at 45.

d.

President Trump responds that the Committee has failed to identify its proposed legislative work with enough specificity

across all three investigative tracks. He suggests the passage of H.R. 1 in the House means the Committee can no longer justify its subpoena based on a need for information related to that proposal. At the same time, he dismisses the Committee's less developed legislative proposals as an "unexplained gesture toward unknown legislation" lacking the specificity with which Congress must identify its aims. Trump Br. 37. But if Congress cannot obtain presidential information either early or late in the legislative process, then it could never obtain presidential information. "Legislative inquiries," though, "might involve the President in appropriate cases." *Mazars*, 140 S. Ct. at 2033.

Congress may satisfy the third *Mazars* factor by citing examples of legislative reforms at various points in the process of turning a policy proposal into enacted legislation. *See Mazars*, 140 S. Ct. at 2036. At an early stage, when the language of a bill is still being drafted, presidential information could help Congress craft policy solutions to the problem it has identified. Once a bill has been reported by the Committee or even passed by the full House, it remains possible that the bill might later return to the House from the Senate. And even if the bill were enacted into law, the Committee could always consider further reforms. As for H.R. 1 specifically, some constituent parts of that bill, including aspects related to presidential ethics, have subsequently been introduced as standalone legislation in the House, while the larger bill remains pending in the Senate. First Maloney Mem. 13. Both the Committee's legislative process and its investigation are ongoing. So is its interest in President Trump's financial information, as explained in detail in the Maloney Memoranda.

The Committee has adequately explained, under the third *Mazars* factor, that President Trump's financial information would advance the Committee's consideration of ethics reform

legislation across all three of its investigative tracks. But the first and second *Mazars* factors require more. The President's information must also be insufficiently available from other sources, and the subpoena must be no broader than reasonably necessary. We turn to those questions next.

2.

Under the first *Mazars* factor, we "carefully assess whether the asserted legislative purpose warrants the significant step of involving the President and his papers." 140 S. Ct. at 2035. And "Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs in light of its particular legislative objective." *Id.* at 2035–36.

We understand the standard Congress must meet to justify involving a President's papers as something more than potential relevance but less than a demonstrated, specific need. With respect to the lower end of that spectrum—i.e., the need to show more than mere potential relevance to Congress's purposes—the Supreme Court explained in this case that "[u]nlike in criminal proceedings," in which the integrity of the process requires "full disclosure of all the facts," the legislative process involves "predictive policy judgments that are not hampered in quite the same way when every scrap of potentially relevant evidence is not available." *Id.* at 2036 (citations, alterations, and quotation marks omitted). At the other end of the spectrum, the Court also specified that Congress need not establish a "demonstrated, specific need" for presidential information, nor need it show that the information is "demonstrably critical to its legislative purpose." *Id.* at 2032–33 (citation and quotation marks omitted).

If Congress shows the requisite need for at least some presidential information to further its legislative purposes, then the scope of the information sought must remain sufficiently connected to those purposes. The second *Mazars* factor embodies that understanding. It calls for courts to "insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective." *Id.* at 2036. The required specificity "serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President." *Id.* (quoting *Cheney*, 542 U.S. at 387). The second *Mazars* factor thereby works in conjunction with the first factor to delineate how much, if any, presidential information Congress may obtain.

We determine here that the Committee has shown the requisite need for some, but far from all, of the presidential information covered by its subpoena. Since President Trump left office, the Executive Branch has not taken a position in this case on the validity of the Committee's subpoena. With respect to its scope, though, the Branch has elsewhere recently characterized the Mazars subpoena as a "dragnet request." *Ways & Means Comm.'s Request for the Former President's Tax Returns & Related Tax Info. Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. __, slip op. at 29 (July 30, 2021). We find that the "dragnet" reach of the subpoena cannot be supported under any of the Committee's three investigative tracks. The Committee, however, has shown sufficient need— more than mere potential relevance but less than a demonstrated, specific need—for a significantly narrowed subset of the subpoenaed information.

a.

We begin, again, with the emoluments track. As the evidence discussed with respect to the third *Mazars* factor

indicates, the Committee has identified specific emoluments-related legislative proposals responding to evidence that foreign and domestic governments reportedly spent millions of dollars at President Trump's businesses during his tenure. First Maloney Mem. 24. The Committee thus contends that President Trump's information will inform its consideration of emoluments-related legislation, including bills that would require federal agencies to report spending at a President's properties or require reimbursement of taxpayer dollars spent at a President's properties. *Id.* at 30.

i. That legislative purpose supports the involvement of President Trump's papers in some measure. As a general matter, when inquiring "into the administration of existing laws" or studying "proposed laws," Congress naturally might wish to understand "defects" in existing "economic or political system[s]" and laws "for the purpose of enabling the Congress to remedy them." *Mazars*, 140 S. Ct. at 2031 (citation and quotation marks omitted). Here, the Committee would benefit from knowing how much, and the ways in which, money flowed to President Trump from foreign and domestic governments to craft legislation that would address those types of payments in the future. If President Trump received predominantly small payments from government officials when they patronized his hotel, that might suggest one type of legislative solution. If his papers instead reveal that he received favorable loan terms from foreign governments on overseas development deals, that might warrant a different sort of legislative response.

The Committee lacks an adequate alternative source to inform its consideration of that kind of emoluments-related legislation. Among recent Presidents, according to the Committee, only President Trump declined to divest himself of his business interests and place his assets in an independent

blind trust, thus failing to separate himself from emoluments received during his tenure.  And the Committee has concluded that President Trump's "complex and opaque financial holdings" were "unprecedented" among modern Presidents.  First Maloney Mem. 3.  In view of the apparent volume of spending by government actors at President Trump's properties while he was in office, the Committee alleges that the "financial disclosure laws have never been tested in this way by a president."  *Id.* at 38.

The unique features of the Trump Presidency, as understood by the Committee and undisputed by President Trump here, indicate that no other President's information would prove fruitful to advancing the Committee's legislative purposes.  The information of other officials subject to the Foreign Emoluments Clause would fail to serve the Committee's purposes in the same way.  The Committee's proposed legislation seeks to manage the unique conflicts of interest arising from presidential emoluments—for instance, the conflicts attendant to federal agency spending at businesses owned by the official with appointment and removal power over the heads of those agencies.  And because the Domestic Emoluments Clause applies to only the President, President Trump's businesses are in the unique position of likely having documented the receipt of such payments.  *See* U.S. Const. art. II, § 1, cl. 7.  As the Committee puts it, his information may show the "tangible and intangible benefits President Trump has received" and how his businesses have "kept track of or failed to keep track of" payments qualifying as emoluments.  House Br. 49 (citation omitted).  His records are thus likely to be the best source for the Committee's inquiry directed at legislation governing the reporting of emoluments.

Of course, Congress may not look to President Trump "as a 'case study' for general legislation."  *Mazars*, 140 S. Ct. at

2036. But here, President Trump has uniquely pertinent information that cannot reasonably be obtained from any other source. And the legislation under consideration (along all three investigative tracks) is President-specific—targeting presidential disclosures and conflicts of interest—rather than general. In those circumstances, the Committee has shown that its emoluments-related legislative purposes warrant involving President Trump's papers.

President Trump objects that knowing the exact amount of emoluments he received is unnecessary for consideration of emoluments-related legislation, especially when the Committee already has substantial evidence indicating that he received foreign and domestic emoluments. Trump Br. 39. But that argument amounts to demanding that the Committee show a demonstrated, specific need for the records, a standard that the Supreme Court explicitly rejected. We are persuaded that understanding the nature and scope of the "defects" in existing laws and systems will sufficiently aid the Committee in tailoring its solution. *Mazars*, 140 S. Ct. at 2031 (citation omitted). The amount and type of emoluments received by the former President may inform what legislative reform is most appropriate: for instance, the Committee may choose to ban emoluments altogether above a certain threshold, while requiring additional disclosures of smaller gifts or payments. We also appreciate the legislative reality that conveying the scope of a problem may help the Committee garner the necessary support to enact a legislative fix: as the Committee explains, the facts gathered during the legislative process aid in demonstrating "the need for such legislation to Members of the House and Senate as well as to the American public." First Maloney Mem. 54.

ii. Still, the Committee's emoluments-related objectives cannot possibly justify the breadth of documents encompassed

by the subpoena. Both the timeframe and the type of documents covered by the subpoena range substantially beyond what is "reasonably necessary" to support the Committee's legislative objectives related to emoluments. *Mazars*, 140 S. Ct. at 2036.

With regard to the timeframe, the Committee requests information for the period 2011–2018. We agree with the district court that the emoluments track justifies information from only 2017 and 2018, the years in which President Trump could have received emoluments while in office. The Committee responds that a snapshot in time is not enough; only "an understanding of President Trump's financial relationships as they existed *before* he took office," would allow the Committee to determine "whether changes in those relationships *after* he took office may reflect impermissible emoluments." House Br. 81. But as the Supreme Court explained, "efforts to craft legislation involve predictive policy judgments" that do not require all relevant evidence. *Mazars*, 140 S. Ct. at 2036. While some of President Trump's prior transactions could provide context for his business dealings with foreign governments, the Committee has failed to demonstrate on the record before us that his financial records from before 2017 would do so. We thus conclude that those earlier documents are not reasonably necessary for Congress to understand President Trump's alleged financial entanglements with government actors while in office.

We turn next to the scope of relevant documents. The subpoena demands information with respect to the following individual and entities: Donald J. Trump, the Donald J. Trump Revocable Trust, the Trump Organization Inc., the Trump Organization LLC, the Trump Corporation, DJT Holdings LLC, the Trump Old Post Office LLC, the Trump Foundation, along with any affiliates. The Donald J. Trump Revocable

Trust is the principal holding entity for President Trump's business assets and major operating companies following the 2016 election, including the Trump Organization Inc., the Trump Organization LLC, the Trump Corporation, and DJT Holdings LLC. Trump Old Post Office LLC is the federal leaseholder of the Old Post Office Building in Washington, D.C., and operator of the Trump International Hotel. And the Trump Foundation was a charitable organization dissolved in 2018, which the Committee believes President Trump used for personal purposes.

The subpoena seeks four types of information from those entities. First, "statements of financial condition, annual statements, periodic financial reports, and independent auditors' reports prepared, compiled, reviewed, or audited by Mazars USA LLP or its predecessor, WeiserMazars LLP"—in other words, accounting records. 2021 Subpoena. Second, "all engagement agreements or contracts related to the preparation, compilation, review, or auditing of" those accounting records. *Id.* Third, "[a]ll underlying, supporting, or source documents and records used in the preparation, compilation, review, or auditing of [the accounting records], or any summaries of such documents and records relied upon, or any requests for such documents and records." *Id.* Fourth, "all memoranda, notes, and communications related to the preparation, compilation, review, or auditing of the [accounting records]." *Id.* Such communications include, but are not limited to, "all communications between Donald Bender and Donald J. Trump or any employee or representative of the Trump Organization; and all communications related to potential concerns that records, documents, explanations, or other information, including significant judgments, provided by Donald J. Trump or other individuals from the Trump Organization, were incomplete, inaccurate, or otherwise unsatisfactory." *Id.*

The Committee's emoluments-related legislative objectives fail to show a reasonable need for that scope of information. The Committee's investigation under the emoluments track relates solely to payments made by foreign and domestic government actors to the former President during his tenure. But the subpoena as drafted covers a vast universe of information unconnected to that subject.

The subpoena to Deutsche Bank from the House Permanent Select Committee on Intelligence seeking similar information is instructive in considering the appropriate scope of the Mazars subpoena under the emoluments track. After the Supreme Court set forth the *Mazars* test, the Intelligence Committee limited the documents and information sought, in most instances, to those showing or potentially revealing "any financial relationships, transactions, or ties between [Trump entities] and any foreign individual, entity, or government." *See* Schiff Memorandum 11–12. A similar limitation is warranted here.

The requested accounting records, source documents, engagement letters, and communications qualify as reasonably necessary to support the Committee's emoluments-related objectives only to the extent they relate to any financial relationships, transactions, or ties between President Trump or the other Trump entities and actors potentially subject to the Emoluments Clauses—i.e., a foreign state or foreign state agency, the United States, a federal agency, a state or a state agency, or an individual government official. Without such a limitation, the subpoena sweeps in reams of unrelated records and is substantially broader than reasonably necessary to inform the Committee's legislative efforts concerning emoluments.

As limited, the subpoena will provide Congress only those records sufficiently related to payments made to President Trump or Trump entities, during his tenure in office, from foreign and domestic governmental actors. Information related to those foreign and domestic payments satisfies the first and second *Mazars* factors.

b.

We turn next to the GSA lease track of the Committee's investigation. That track involves legislative reforms aimed at increasing oversight of contracts between Presidents and the federal government.

i. We first conclude that the Committee's proposed general reforms to GSA bidding processes do not warrant the significant step of involving President Trump's papers. As President Trump correctly contends, similar information about the bidding process for leasing GSA properties could be obtained from any leaseholder. The processes for awarding the Old Post Office lease to Trump Old Post Office LLC and managing it before his term as President were not specific to him. The GSA "owns and leases over 376.9 million square feet of space in 9,600 buildings in more than 2,200 communities nationwide." *GSA Properties*, https://tinyurl.com/mwcev3yj (last visited June 7, 2022). Another leaseholder's records would thus serve as an adequate alternative source of information for the Committee's legislative purposes related to inaccuracies in bidding documents. And Congress may not use President Trump "as a 'case study' for general legislation" concerning the bidding process more broadly. *Mazars*, 140 S. Ct. at 2036.

The Committee's more specific proposals concerning presidential contracting while in office fare better. According

to the Committee, no other President was a federal leaseholder while in office. And as the official who appoints and has the power to remove the GSA Administrator, the President carries a risk of undue influence over the GSA not shared by any other leaseholder or officeholder. The Committee seeks President Trump's records to determine the ways in which he may have exploited his position to pressure the GSA into permitting him to violate the Old Post Office lease—information that would allow the Committee to tailor its legislative response. And his records may reveal further conflicts of interest related to the hotel. As noted, in a 2019 report, the GSA Inspector General found "serious shortcomings" in GSA's management of the emoluments issues related to the Old Post Office lease. First Maloney Mem. 18. The Committee wishes to obtain President Trump's records to determine the extent of those shortcomings so that it can fashion legislation to prevent similar problems from recurring, whether by prohibiting presidential contracting with the government altogether or instead increasing reporting and oversight requirements for future presidential leaseholders.

President Trump's papers are the Committee's only reasonably available source of information for legislation concerning the management of federal leases held by Presidents. To be sure, there is no guarantee that his financial information will reveal additional problems with GSA's management of the lease. The Committee, of course, cannot know exactly what it will find in President Trump's papers before it has them. But we conclude that his papers are likely to provide further insight into GSA's management of the Old Post Office lease during his presidency. And those insights would help the Committee in considering legislation to insulate the agency from pressures exerted by presidential leaseholders. The Committee again need not show a demonstrated, specific need for the President's papers—just that other sources would

not reasonably provide the needed information to advance the particular legislative objective. *Mazars*, 140 S. Ct. at 2035–36.

President Trump contends that, inasmuch as his alleged conflict of interest is already "apparent," no additional information is required. Trump Br. 46. While the continuation of a federal lease by the President may present a readily "apparent" conflict of interest, the Committee is concerned with the particulars of GSA's management of that conflict to inform its consideration of legislative responses. Only President Trump's papers can provide a full picture of GSA's management of the lease during his Presidency. And only his information will shed light on how and why GSA determined that he could maintain the lease, information that could aid the Committee in considering legislation to govern GSA's management of any similar arrangements in the future. Although the Committee has the revenues President Trump reported for Trump Old Post Office LLC in 2017, 2018, and 2019, omissions from—or additional specificity in—the breakdown of that revenue could help the Committee decide what disclosures GSA should require from presidential leaseholders. And at the very least, the Trump Old Post Office LLC's hotel ledger will reveal whether and how often personnel from federal agencies patronized the Trump International Hotel, potentially guiding the Committee in enacting prospective legislation limiting or prohibiting federal agency spending at a President's properties.

President Trump emphasizes that the Committee has already received documents directly from GSA as part of its investigation into his Old Post Office lease. But the inquiry into alternate sources under the first *Mazars* factor concerns whether sources other than a President's information may inform the Committee's purposes, not whether another third-party custodian may also provide the Committee with that

President's information. In any event, the Committee has expressed its intention "to reduce Mazars' burden by excluding identical documents received from GSA" from the scope of the information requested under the GSA track. Notice at 1, *Mazars USA LLP*, 560 F. Supp. 3d 47 (No. 19-cv-01136), ECF No. 67. The extent to which the information possessed by Mazars is duplicative of information already obtained from the GSA cannot be known unless and until the Committee receives the former, but the Committee has already committed to eliminating duplication.

ii. Once again, however, the Committee's legislative objectives cannot possibly justify the vast scope of information covered by the subpoena. At oral argument, counsel for the Committee conceded that the GSA track could not justify the full breadth of the subpoena. Oral Arg. Tr. 62. Here again, we must significantly narrow it.

We begin again with the relevant timeframe. The Committee's request reaches back to 2011 because the Committee wishes to investigate possible inaccuracies in President Trump's self-reporting during the bidding process for the Old Post Office lease. GSA began soliciting proposals for the redevelopment of the Old Post Office on March 24, 2011, and Trump Old Post Office LLC submitted its initial proposal on July 20, 2011. But information relating to possible misrepresentations made by President Trump during the bidding process before he was elected President do not warrant the involvement of his papers. The legislation under consideration in the GSA track that warrants involvement of President Trump's papers aims to tighten requirements for submissions from federal leaseholders "who may be able to exert undue influence on GSA." First Maloney Mem. 23. And the relevant legislative proposals identified by the Committee correspondingly pertain to the management of federal leases

held by a President—the person who appoints and can remove the GSA Administrator—not by persons who have yet to become President. As a result, only information from November 2016 through 2018, during which time President Trump was the President-elect and then President, could be reasonably necessary to support Congress's legislative purpose. The Committee has made no suggestion that persons who have yet to become President "may be able to exert undue influence on GSA." *Id.*

Having limited the years covered by the subpoena, we next consider the scope of documents and entities encompassed by the subpoena for those years. We agree with the district court that the GSA track justifies the full scope of documents with respect to one entity: Trump Old Post Office LLC, the Trump International Hotel's holding company. Trump Old Post Office LLC is the holder of the Old Post Office lease and operates the Trump International Hotel in Washington, D.C. That entity was specifically created to enter the GSA lease and does not appear to be involved with President Trump's other business ventures. We thus conclude that all documents belonging to Trump Old Post Office LLC from the relevant years are sufficiently likely to inform the Committee's legislative objectives concerning the GSA lease, either directly or indirectly by their relation to operation of the hotel.

As for all other listed entities, however, the subpoena is overbroad. Those entities cover several of President Trump's privately held businesses, which operate properties across the United States and the world, as well as the now defunct Trump Foundation charitable organization. Enforcing the subpoena as to those entities could sweep in documents entirely unrelated to the GSA lease, which concerns just one of President Trump's properties—the Trump International Hotel.

As a result, on the record before the court, as to listed entities other than Trump Old Post Office LLC, the Committee has supplied sufficient evidence that its legislative objectives support obtaining only those documents that relate to the Old Post Office lease. The Committee's own requests to GSA demonstrate the type of narrowing that is necessary: in a letter to GSA in April 2019, even the Committee's broadest request asked only for "all documents referring or relating to Mazars USA LLP or WeiserMazars LLP related to the Old Post Office lease." Letter from Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, & Gerald E. Connolly, Chairman, House Subcomm. on Gov't Operations, to Emily Murphy, Adm'r, Gen. Servs. Admin. 3 (Apr. 12, 2019),https://perma.cc/R3K7-EFS7. For purposes of the GSA lease track, the Mazars subpoena must be limited to information referencing, indicating, discussing, or otherwise relating to, the Old Post Office lease. So narrowed, the subpoena satisfies the first and second *Mazars* factors under the GSA track.

c.

We lastly consider the financial disclosures track. In our view, the Committee's request for records under that track presents a particularly close question. But we conclude that, when significantly narrowed, the Committee's disclosure-related legislative purposes satisfy the first and second *Mazars* factors.

i. Recall that under the financial disclosures track, the Committee is considering legislation requiring additional disclosures from Presidents and presidential candidates under the Ethics in Government Act or, alternatively, divestment of assets upon assuming the Office of the Presidency. The House has already passed H.R. 1, provisions of which would require

Presidents to divest certain financial holdings posing potential conflicts of interest and to disclose financial interests exceeding $10,000. *Id.* at 12–13. The bill would also require candidates for President and Vice President to disclose ten years of federal tax returns to the Federal Election Commission. *Id.* at 13. Other proposed legislation concerns "what additional information Congress should require presidents and presidential candidates to disclose about their financial holdings," including whether to extend the covered time period for disclosures or to require submission of supporting documents. *Id.* at 13–14. Through those kinds of proposals, the Committee aims to address the concerns raised by ostensible misrepresentations and omissions in President Trump's financial disclosure forms.

We note that a host of government officials besides Presidents are subject to the disclosure requirements of the Ethics in Government Act, including Vice Presidents, Members of Congress, executive branch employees classified at GS-16 or above, judicial officers and employees, and other officials. 5 U.S.C. app. § 101(f). President Trump is not the first federal official to be accused of unethical behavior, including omissions from required disclosures.

But the Committee's aim is not to close just any gaps in the financial disclosure laws. It wants to close the specific gaps that President Trump allegedly exploited. And Congress may inquire into "defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Mazars*, 140 S. Ct. at 2031 (2020) (quoting *Watkins*, 354 U.S. at 187). So while the information of another official might provide the Committee with general information about what current financial disclosure laws capture, no other official's records will provide information concerning the specific loopholes President Trump allegedly exploited in failing to

fully report his potential conflicts of interest. President Trump is the only official accused of the particular misrepresentations the Committee seeks to prevent, so his records serve as the only reasonably available source to inform that legislation. (And as explained below, we will permit the Committee access to only those records pertaining to those specific misrepresentations.)

The Committee has presented substantial evidence of the ethics legislation under consideration and has explained why learning more about misrepresentations identified in President Trump's disclosures would be helpful for enacting those ethics reforms. The Committee's information about how the former President's papers will inform its legislative aims is less than perfect, but that is primarily a consequence of the fact that the Committee has not received the documents it requested. The entire purpose of its investigation is to uncover details that the Committee does not already have yet needs to inform the passage of legislation.

If the level of evidence presented by the Committee here does not suffice to obtain a narrowed subset of the former President's information, we doubt that any Congress could obtain a President's papers under a disclosure-related rationale. The Committee has likely provided as much detail as possible without having access to the information it seeks. And the *Mazars* test could not have been intended to prevent Congress from ever obtaining the President's information in connection with disclosure-related legislative purposes. Requiring disclosures aimed at preventing Presidents from engaging in self-dealing and other conflicts of interest is assuredly a legitimate legislative purpose. We conclude that the Committee has carried its burden to show that no other source of information can adequately assist it in closing the gaps that allegedly allowed President Trump to avoid disclosing potential conflicts of interest.

We recognize that future committees could seek a President's papers by claiming to be studying legislation requiring disclosures of precisely the type of record sought or legislation targeting specific actions by that President. But the Committee seeks to address the gaps that allegedly allowed this President to make numerous omissions in his disclosure forms, evidence of which President Trump does little to dispute. That warrants involvement of his papers to aid the Committee's consideration of legislation closing those loopholes. The narrowing that we will accomplish next also does much to address this concern: to the extent that a future committee seeks evidence of discrepancies where none exists, an appropriately tailored subpoena will turn up nothing at all.

The information the Committee receives will help it tailor potential legislative reforms to the problems it wishes to address. If President Trump's information reveals that any discrepancies were merely a mistake, the Committee could respond with clarified instructions. But if the omissions reveal themselves to be intentional, the Committee may instead choose to require the submission of additional source information. President Trump's papers also may provide the Committee with valuable insight into how to craft disclosure laws that capture the full ownership structure of a future President's businesses.

ii. Although the Committee has shown adequate need to involve President Trump's papers on the financial disclosures track, here again, the subpoena is far too broad as drafted.

We begin with the timeframe. Mr. Trump filed his first financial disclosure as a candidate for office on July 15, 2015, reporting information stretching back to the beginning of 2014. First Maloney Mem. 43. The Committee intends to close the loopholes that allowed candidate and President Trump to avoid

disclosing relevant information about his financial holdings in those required forms. That purpose justifies obtaining information beginning in 2014—the first year covered by President Trump's disclosure forms. We are unpersuaded by the Committee's argument that it requires information stretching back to 2011 to consider whether existing laws should "reach[] farther back in time and require[] additional disclosure." House Br. 69 (quoting First Maloney Mem. 43). Information from before 2014 is not reasonably necessary to determine what President Trump left out of his required disclosures as a presidential candidate.

The scope of documents encompassed by the subpoena is substantially overbroad. At its crux, the Committee's inquiry seeks to ascertain what President Trump ostensibly omitted from his required disclosure forms, whether because of misrepresentations or because of gaps in the required disclosures. Accounting records, source documents, and engagement agreements are therefore reasonably necessary only to the extent they reference, indicate, or discuss any undisclosed, false, or otherwise inaccurate information about President Trump's or a Trump entity's reported assets, liabilities, or income for the period 2014–2018. We trust that President Trump's third-party accountant will comply with the court's order to disclose all such information by carefully assessing which information falls within that description. Similarly targeted language has been used in prior subpoenas seeking information about inaccuracies in public disclosures. *See U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Cos., Inc.*, 390 F. Supp. 2d 27, 37 (D.D.C. 2005).

As for the subpoena's coverage of communications between Mazars and President Trump or the other listed entities, the Committee justifies its request for all such communications as necessary to determine whether the

identified discrepancies were based on intentional misstatements or instead occurred by mistake. The disclosure of all communications between Mr. Trump and Donald Bender, the partner who reportedly manages his accounts, has not been justified by that investigative purpose. The subpoena already singles out communications "related to potential concerns that records, documents, explanations, or other information, including significant judgments provided by Donald J. Trump or other individuals from the Trump Organization, were incomplete, inaccurate, or otherwise unsatisfactory." 2021 Subpoena. The subpoena must be limited in that way for all communications, including those involving Mr. Bender. Although some communications between President Trump and his accountants are reasonably necessary to understand his assets, we hold that the Committee can access only those communications related to potential concerns about misrepresentation or omissions.

As narrowed, the subpoena would provide Congress with only that subset of information related to omissions that President Trump made in his disclosures as a presidential candidate and as President. That confined scope satisfies the first and second *Mazars* factors.

iii. President Trump contends Congress cannot need his documents for prospective legislation to govern future Presidencies when the Committee has described his Presidency as "unique and unprecedented" and "a class of one." Trump Reply Br. 46 (citations omitted). According to President Trump, "[n]o rational Congress would craft laws that will apply to all future officials by focusing on the finances of a single, wildly unrepresentative official." *Id.* But a court has no warrant to limit Congress's consideration of legislation responding to a problem it would like to solve merely because the importance of the issue may be unapparent to the court. It

is not our role to question whether enacting generalized prospective legislation based on a particularized past problem makes good policy. We leave it to Congress to assess the likelihood that history may repeat itself.

There is also ample precedent for singular events inducing broad legislative responses. The Watergate scandal was a unique event in American history, yet it inspired a bevy of ethics-reform legislation, including the Ethics in Government Act. And we recently recognized Congress's "uniquely vital interest" in considering remedial legislation in response to the "unprecedented" January 6 attack on the Capitol. *Thompson*, 20 F.4th at 17, 33. Insofar as President Trump may seem to be in a class of one per the Committee's own characterization, Congress could enact legislation to prevent perceived conflicts of interest that arose during his Presidency from happening again. And it is entirely possible that a future President or presidential candidate will have similarly complex finances or business holdings. Even if the Committee believes that President Trump was the first President of his kind in certain respects, it can act out of a concern that he will not be the last.

### 3.

Having applied the first, second, and third *Mazars* factors to the Committee's subpoena, we now take up the fourth factor, which is the last one specifically enumerated by the Supreme Court. And because we already have considerably circumscribed the subpoena pursuant to our obligation to "insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective," 140 S. Ct. at 2036, we apply the fourth *Mazars* factor to the subpoena as narrowed. Under that factor, we must "assess the burdens imposed on the President by [the] subpoena." *Id.* We conclude that the subpoena, as narrowed, does not impose any unwarranted

burdens on President Trump, so it need not be quashed or further limited under the fourth *Mazars* factor.

Now that President Trump is out of office, any burdens the Committee's subpoena imposes on him will no longer distract the head of the Executive Branch. That is significant in view of the Supreme Court's emphasis on avoiding "unnecessary intrusion into the operation of *the Office of the President.*" *Id.* (emphasis added) (quoting *Cheney*, 542 U.S. at 387). President Trump acknowledges the point, admitting that direct burdens on the President's time and attention "never mattered much to begin with" under the fourth *Mazars* factor, "since no President is going to compile documents himself." Trump Br. 31. What is more, the subpoena is directed to President Trump's accounting firm, not the former President himself. To be sure, the time required to litigate this lawsuit falls on him in some measure. But he chose to bring the lawsuit, and at any rate, the "time and attention stemming from judicial process and litigation, without more, generally do not cross constitutional lines." *Mazars*, 140 S. Ct. at 2036. That must be especially true in the case of a President no longer in office.

President Trump contends that the subpoena is overly burdensome because of the sheer volume of personal financial records it seeks. He characterizes a subpoena seeking a full accounting of his personal financial situation as unnecessarily intrusive in its lack of specificity. But we have now narrowed that subpoena to ensure it is no broader than reasonably necessary to support the Committee's specific legislative objectives under each of its three investigative tracks. Compliance with the subpoena as narrowed, in our view, does not impose an undue burden on President Trump for purposes of the fourth *Mazars* factor.

56

\*    \*    \*

In light of the required narrowing of the Committee's subpoena as enumerated above, we hold that the Committee's legislative aims under its three investigative tracks, considered in combination, justify production of only the following subset of information encompassed by its subpoena: accounting records, source documents, and engagement letters from 2014–2018 that reference, indicate, or discuss any undisclosed, false, or otherwise inaccurate information about President Trump's or a Trump entity's reported assets, liabilities, or income; associated communications from 2014–2018 related to potential concerns that information provided was incomplete, inaccurate, or otherwise unsatisfactory; all requested documents from November 2016–2018 belonging to Trump Old Post Office LLC; all documents from November 2016–2018 referencing, indicating, discussing, or otherwise relating to, the Old Post Office lease; and all documents from 2017–2018 related to financial relationships, transactions, or ties between President Trump or a Trump entity and any foreign state or foreign state agency, the United States, any federal agency, any state or any state agency, or an individual government official.

As substantially narrowed in that fashion, we conclude that the Mazars subpoena is "no broader than reasonably necessary to support Congress's legislative objective[s]" across the Committee's three investigative tracks. *Mazars*, 140 S. Ct. at 2036. Again, the Committee need not show that it has a "demonstrated, specific need" for that subset of information, nor that the subset of information is "demonstrably critical" to its legislative purposes. *Id.* at 2032 (citations omitted). Rather, "reasonably necessary" is the relevant standard, *id.* at 2036, and we believe that standard is met when the subpoena is narrowed as set out in the preceding paragraph.

President Trump advances one last, overarching objection to our effort to render the subpoena consistent with the *Mazars* factors. In his view, once a court concludes that a congressional subpoena for presidential information is overbroad in any respect, the court cannot itself narrow the subpoena. Rather, he submits, the court must simply invalidate the overbroad subpoena and send the matter back to Congress to permit it to fashion a new subpoena. We disagree.

The Supreme Court's opinion in this case does not definitively resolve that issue. But in specifying that a court must "insist on a subpoena no broader than reasonably necessary," *id.* at 2036, we believe the Supreme Court intended to allow for a court reviewing a subpoena to conduct any required narrowing itself rather than to return the matter to Congress to start the process anew.

In a companion case decided on the same day as this case, the Supreme Court recognized that courts possess "inherent authority to quash *or modify* [a] subpoena" and "should use" that power to prevent interference with the President's duties. *Trump v. Vance*, 140 S. Ct. 2412, 2431 (2020) (emphasis added). Although that case concerned a state grand jury subpoena, the same principle naturally applies to a congressional subpoena. And in the context of congressional subpoenas in particular, we have explained that courts have the power to modify a subpoena seeking "privileged or other protected matter." *Comm. on Judiciary v. McGahn*, 968 F.3d 755, 772 (D.C. Cir. 2020) (en banc) (citation omitted). Indeed, the Federal Rules of Civil Procedure give courts discretion to modify rather than quash a subpoena that subjects a person to an undue burden. Fed. R. Civ. P. 45(d)(3)(A). And we have suggested that district courts must, "when appropriate, consider the possibility of modifying the subpoena rather than quashing" it, even in the context of subpoenas seeking sensitive Executive

Branch documents. *See Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984); *see also Linder v. Nat'l Sec. Agency*, 94 F.3d 693, 698 (D.C. Cir. 1996).

In nonetheless contending that courts lack the authority to narrow a congressional subpoena, President Trump relies principally on *United States v. Patterson*, 206 F.2d 433 (D.C. Cir. 1953). There, we extended the rule that a person may not be held in contempt "under a subpoena that is part good and part bad" to indictments resting on congressional subpoenas. *Id.* at 434 (quoting *Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951)). In such situations, "[t]he burden is on the court to see that the subpoena is good in its entirety and it is not upon the person who faces punishment to cull the good from the bad." *Id.* *Patterson*'s "good in its entirety" rule implicates "principles of equal justice" and considerations of individual due process that are not at issue here. *Id.* Nothing in that decision constrains a court's ability to modify a subpoena in advance, as we do here: when a court prospectively narrows a subpoena, it discharges—rather than disregards—any duty on its part to ensure that a subpoena, as so modified, is "good in its entirety."

Our sister circuit came to the same conclusion when initially considering the congressional subpoenas issued to Deutsche Bank and Capital One for President Trump's information. The Second Circuit expressed concerns that the subpoenas as drafted could require the disclosure of documents that "might reveal sensitive personal details having no relationship to the Committees' legislative purposes." *Deutsche Bank AG*, 943 F.3d at 667. The court outlined a procedure by which the district court could exclude, on identification by the challenging parties, those sensitive materials and other documents having "such an attenuated

relationship to the Committees' legislative purposes that they need not be disclosed." *Id.* at 667–68.

We agree that courts have that kind of authority. And we exercise that authority to narrow the Committee's subpoena to the extent necessary for us to sustain it as consistent with the four factors set out by the Supreme Court.

### III.

The Supreme Court left open the possibility that, in addition to the four factors it specifically enumerated, "[o]ther considerations may be pertinent as well." *Mazars*, 140 S. Ct. at 2036. President Trump advances certain "other considerations" that he believes render the Committee's subpoena categorically unenforceable. He made each of the same arguments when this case was before the Supreme Court. But the Court, rather than invalidate the subpoena on any of those grounds, remanded for examination of the subpoena under the four factors it set out. We are unpersuaded by President Trump's various arguments that the Committee's subpoena is categorically invalid.

### A.

President Trump first contends that the principal purpose of the subpoena is not a legislative one. Rather, he submits, the subpoena centrally seeks to expose his wrongdoing—an illegitimate, non-legislative purpose. *See id.* at 2031–32.

It is of course true that a "congressional subpoena must serve a 'valid legislative purpose.'" *Id.* at 2031 (quoting *Quinn*, 349 U.S. at 161). But in the course of (and sometimes even in furtherance of) pursuing a valid legislative aim, Congress might uncover and seek to understand wrongdoing so

that it can better appreciate the nature of any gaps in existing laws. On that understanding, it is not a "valid objection" to a congressional investigation "that it might possibly disclose crime or wrongdoing." *McGrain*, 273 U.S. at 180. Rather, as we have recently said, "[t]he mere prospect that misconduct might be exposed does not make [a] Committee's request prosecutorial" rather than legislative. *Thompson*, 20 F.4th at 42. After all, "[m]issteps and misbehavior are common fodder for legislation." *Id.*

When this case was before the Supreme Court, President Trump made an extended argument that the Committee had issued the Mazars subpoena for an impermissible law-enforcement purpose—to expose his wrongdoing—rather than for a permissible legislative purpose. Brief for Pet'rs 36–45, *Mazars*, 140 S. Ct. 2019 (No. 19-715) [Trump S. Ct. Br.]. He asked the Supreme Court to invalidate the subpoena on that ground. At that time, the Maloney Memoranda had not been prepared, and Chairman Cummings's succinct memorandum served as the Committee's primary explanation for the subpoena. That memorandum concluded by stating, without any elaboration, that the Committee's investigation "inform[ed] its review of multiple laws and legislative proposals under [its] jurisdiction." Cummings Mem. 4. And as President Trump emphasizes, the memorandum also cited, as the first of four areas of ongoing inquiry, "investigat[ion] [of] whether the President may have engaged in illegal conduct before and during his tenure in office." *Id.*

The Supreme Court's decision subsequently explained, in language we have quoted multiple times in this opinion, that "when Congress contemplates legislation . . . concerning the Presidency," it will be "impossible to conclude that a subpoena is designed to advance a valid legislative purpose unless Congress adequately identifies its aims and explains why the

President's information will advance its consideration of the possible legislation." *Mazars*, 140 S. Ct. at 2036 (citation and quotation marks omitted). Our previous application of that *Mazars* factor, taking into consideration the Committee's detailed explanation in the Maloney Memoranda, shows that the Committee's subpoena "is designed to advance a valid legislative purpose," *id.*, not an illegitimate law-enforcement one. We have already concluded that the Committee has adequately justified the Mazars subpoena as aiding its consideration of a raft of potential legislation.

President Trump characterizes the Maloney Memoranda as impermissible, retroactive rationalizations of an improper purpose. The Committee responds that it provided the additional detail in the Maloney Memoranda to clarify its legislative purposes in response to the Supreme Court's decision, rather than to justify an illegitimate subpoena after the fact.

We previously established that we may consider the Maloney Memoranda in evaluating the Committee's reasons for issuing and reissuing the subpoena. And in evaluating the legitimacy of the subpoena, "we do not look to the motives alleged to have prompted it." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 508 (1975). "In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed," but "[c]ourts are not the place for such controversies." *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951); *see Eastland*, 421 U.S. at 509. We thus accept the legislative purposes the Committee sets forth in detail in the Maloney Memoranda, and we have explained why the Committee's extended accounting of its purposes in those memoranda "adequately identifies its aims and explains why the President's information will advance its consideration of the possible legislation." *Mazars*, 140 S. Ct. at 2036.

B.

President Trump next contends that the Committee's subpoena is not pertinent to any constitutional legislation. A congressional subpoena "must concern a subject on which legislation could be had." *Id.* at 2031 (citation, alteration, and quotation marks omitted). At this juncture, however, we do not know the particulars of any legislation that Congress might ultimately enact, and those particulars might differ significantly from proposed legislation currently under consideration. In fact, the Supreme Court specifically envisioned that courts would examine congressional subpoenas issued in "contemplat[ion of] legislation that raises sensitive constitutional issues, such as legislation concerning the Presidency." *Id.* at 2036. And the Supreme Court did not suggest that a court examining a subpoena in that context would be expected to pronounce in advance on whether contemplated legislation addressing such "sensitive constitutional issues" passes constitutional muster.

In any event, there is no reason to conclude at this point that any legislation in the areas considered by the Committee would necessarily present a constitutional problem. Each of the Committee's three investigative tracks contemplates legislation to strengthen disclosure requirements related to conflicts of interest, presidential contracts, and emoluments. And as we explained previously in this case, examples throughout the United States Code, including the Ethics in Government Act, suggest that there is "no inherent constitutional flaw in laws requiring Presidents to publicly disclose certain financial information." 940 F.3d at 734–37.

Before the Supreme Court, President Trump argued that the Committee's subpoena could not result in any valid legislation, in part because requiring additional disclosures

from future Presidents would be unconstitutional. *See* Trump S. Ct. Br. 45–52. The Supreme Court, while not specifically addressing that argument in its opinion, did not take up President Trump's invitation to invalidate the Committee's subpoena on that basis. We find no reason now to do so.

### C.

President Trump next contends that the subpoena is per se invalid because the Committee has offered no assurances that the financial information it obtains will be kept confidential from other members of Congress or the public at large. Because the Committee has resisted his request for confidentiality, he maintains, the Committee's true aim must be to publicly expose him.

It is understandable that a lack of guaranteed confidentiality would give President Trump pause about the disclosure of his personal financial records. But we see no basis for imposing a blanket requirement for a congressional committee to assure confidentiality when issuing a subpoena for presidential information. Before the Supreme Court, President Trump argued that the Committee's "desire to publicly expose the President's personal finances" provided grounds for invalidating the subpoena. Trump S. Ct. Br. 20, 38–40. The Court, though, made no mention of confidentiality when enumerating its criteria for evaluating the validity of a congressional subpoena for presidential information. The Court, as discussed, did call for consideration of "the burdens imposed on the President by a subpoena." *Mazars*, 140 S. Ct. at 2036. But it described that concern as generally relating to "burdens on the President's time and attention stemming from judicial process and litigation," *id.*, not to confidentiality-related consequences of disclosure.

The Committee offers a sound justification for its desire to preserve the flexibility to share information it obtains under the subpoena with other legislators. The freedom to share that information could prove important in efforts to persuade other lawmakers of the necessity of proposed legislation. After all, the purpose of a congressional subpoena is to obtain information that Congress can use to craft, debate, and enact legislation. *See Watkins*, 354 U.S. at 187, 197. A categorical rule that Congress must limit access to presidential documents to a small subset of legislators could undermine its ability to carry out those functions. And courts are ill-equipped to determine which specific legislators might require information for Congress to give effective consideration to proposed legislation.

What about disclosure of the information to the general public? Before our court, the Committee has expressed no specific desire to disclose President Trump's documents to the broader public, instead justifying its refusal to guarantee confidentiality solely based on an interest in sharing information with other lawmakers. Even if the Committee did desire to share some portion of the information it receives with the public, that would not automatically invalidate the subpoena.

As the Supreme Court explained in its opinion in this case, it is Congress's "proper duty" to "look diligently into every affair of government and to talk much about what it sees." *Mazars*, 140 S. Ct. at 2033 (quoting *Rumely*, 345 U.S. at 43). Legislators serve in that way as "the eyes and the voice" of their constituents. *Id.* And in our democratic system, Congress's work is typically done in public view. Long ago, moreover, this court explained that it cannot dictate how Congress uses information: "If a court could say to the Congress that it could use or could not use information in its possession, the

independence of the Legislature would be destroyed and the constitutional separation of the powers of government invaded." *Hearst v. Black*, 87 F.2d 68, 71–72 (D.C. Cir. 1936).

Of course, the political branches, including a former President, are free to work out confidentiality arrangements, and we have no reason to doubt that they would honor such agreements. And those sorts of negotiations can continue to take place during the process of enforcing a subpoena directed toward a President or others within the Executive Branch. *See Mazars*, 140 S. Ct. at 2030. For instance, when a House Committee voted to hold a Cabinet Secretary in contempt for withholding documents subject to a congressional subpoena during the Reagan presidency, the parties worked out an "innovative compromise" under which the disputed documents would be made available for a limited period, without access by non-Members of Congress. *Id.*

The fact that Congress and the President have traditionally negotiated over the confidentiality of presidential records suggests that confidentiality is not a bright-line constitutional requirement. As for the courts, it is not the Judiciary's typical role to police Congress's handling of information in its possession. We anticipate that the Committee will handle any records ultimately obtained with due regard for their potentially sensitive nature. But, like the Supreme Court before us, we do not impose a requirement of confidentiality as a blanket precondition to sustaining the subpoena.

D.

In his final argument for categorical invalidation of the Committee's subpoena, President Trump contends that the Committee should have asked him directly for his financial records before issuing a third-party subpoena to his accountant.

And he insinuates that the Committee directed its subpoena to Mazars as a ploy to sidestep the typical accommodation process for resolving congressional demands for presidential documents. *See Mazars*, 140 S. Ct. at 2029–30. He thus suggests that we should give the parties an opportunity to engage in further negotiations before sustaining any portion of the subpoena.

As an initial matter, the Committee was entitled to seek President Trump's personal financial records from a third party. Nothing in the Supreme Court's decision in this case suggests that the Constitution prohibits third-party subpoenas for a President's documents. If Congress were categorically barred from seeking a President's records from third parties, the Supreme Court presumably would have said so, especially given that President Trump made a similar argument before the Court. Trump S. Ct. Reply Br. 7.

As for whether to order the parties to engage in further settlement negotiations, we recognize that disputes over congressional requests for a President's records have traditionally "been hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive." *Mazars*, 140 S. Ct. at 2029 (quotation marks and citation omitted). But while the accommodation process is the preferred method for settling disputes between the political branches over access to the President's documents, the Supreme Court made clear that, when negotiations fail to resolve the matter, courts may step in to decide the interbranch dispute. The *Mazars* test inherently contemplates a situation in which the accommodation process fails to produce an amicable resolution and the dispute enters the courts.

Here, we see no reason to order the parties to negotiate further before we assess the validity of the Committee's

subpoena. President Trump filed this lawsuit in April 2019, and the parties have had ample opportunity to arrive at an agreement in the years since. In June 2021, the district court directed the parties to "assess the possibility of an accommodation," but those efforts proved unsuccessful. 560 F. Supp. 3d at 58. Each side blames the other for the failure of the negotiations. President Trump contends that the Committee unreasonably demanded the ability to take physical possession of his papers. The Committee counters that it made "certain offers of confidentiality," but that President Trump insisted on unworkable restrictions on dissemination within Congress. House Reply Br. 24.

The accommodation process has proven unsuccessful. It now falls to this court to resolve the dispute in accordance with the framework laid down by the Supreme Court and based on the current record. This opinion endeavors to do so.

\* \* \* \* \*

For the foregoing reasons, we affirm in part and reverse in part the judgment of the district court and remand for further proceedings consistent with this opinion.

*So ordered.*

ROGERS, *Circuit Judge*, concurring: Today, the court applies the Supreme Court's framework to assess the validity of a congressional subpoena issued to a sitting President, announced in *Trump v. Mazars*, 140 S. Ct. 2019 (2020), to a congressional subpoena to a former President. This necessarily implicates a number of difficult questions of first impression. *See Trump v. Thompson*, 20 F.4th 10, 41–42 (D.C. Cir. 2021); *Trump v. Mazars USA LLP*, 560 F. Supp. 3d 47, 62–66 (D.D.C. 2021). Based on the record before it, the court has required the subpoena be narrowed. Its narrowing balances the Committee's legislative purposes in requesting certain information from former President Trump, as explained in the two memoranda of the Committee chairperson, against the separation-of-powers concerns surrounding a congressional subpoena first issued to a now-former President during his time in office and subsequently reissued upon his departure.

Given the sensitive nature of the questions of first impression presented here, the parties may seek rehearing because the court has overlooked or misunderstood the Committee's legislative need much less unduly interfered with congressional or presidential prerogatives. Or the parties may retreat to their extreme positions urged upon the court. *See* Op. at 14. Although a court applying *Mazars* to a sitting President must "insist on a subpoena no broader than reasonably necessary," *Mazars*, 140 S. Ct. at 2036, here the court's narrowing has focused on the period in which President Trump was in office.

In the event that the court, in applying the "reasonably necessary" standard, *see id.*, has overlooked or misconstrued the relevance of certain information sought by the Committee to its legislative aims, the Committee may clarify its need for additional documents through supplemental declarations or affidavits. *See, e.g.*, Op. at 40. So too, former President Trump may view the court to have unduly narrowed his executive prerogatives or overstated the relevance of the requested

documents to the Committee's legislative goals, and he may elaborate in supplemental submissions on why the narrowed subpoena violates the "reasonably necessary" standard. The court retains jurisdiction to modify the scope of the subpoena. *See id.* at 57–59. Any supplements to the record may be presented through a petition for rehearing or a petition for rehearing *en banc*. *See* D.C. Cir. R. 35.